**In the Matter of Kenneth Vincent RIVET, Bankrupt.**

**No. BK 66–8387.**

United States District Court
E. D. Michigan, N. D.

April 9, 1969.

Harold H. Bobier, Flint, Mich., referee in bankruptcy.

Sidney B. Schneider, Midland, Mich., trustee..

Christ A. Anagnost, Saginaw, Mich., for trustee.

Daniel E. Clark, Lamson, Humphreys & Clark, Saginaw, Mich., for Household Finance Co.

## RULING ON PETITION FOR REHEARING

ROTH, District Judge.

The petitioner, Household Finance Corporation, a creditor of the Bankrupt, has moved the Court to reconsider its previous ruling which affirmed the Referee's holding invalid, as to the trustee in bankruptcy, a lien held by petitioner on the household goods, and a 250-piece mechanical tool set of the Bankrupt.

The stipulated facts disclose that on May 23, 1964 the Bankrupt borrowed $519.86 from the petitioner. A promissory note was given in like amount and a chattel mortgage was executed to support the loan. On May 27, 1964 a financing statement was filed with the Register of Deeds of the county in which the Bankrupt resided and with the Secretary of State in Lansing, Michigan.

The first loan was refinanced on November 6, 1964, with a present balance of Four Hundred Seventy-two and 03/100 ($472.03) Dollars and a new note and chattel mortgage were executed for the amount of Seven Hundred Twelve and 88/100 ($712.88) Dollars. The original note and chattel mortgage executed on May 23, 1964, were stamped "unpaid balance refinanced and included in new note" and returned to the Bankrupt.

A third loan was made to the Bankrupt and his wife on February 23, 1965, for the amount of One Thousand and 00/100 ($1,000.00) Dollars covering the present balance of Six Hundred Ninety-nine and 45/100 ($699.45) Dollars. A new note and chattel mortgage were executed and the note and chattel mortgage executed on November 6, 1964, were stamped "un-

paid balance refinanced and included in new note" and returned to the Bankrupt.

A fourth refinancing loan was made to the Bankrupt and his wife on August 13, 1965, for One Thousand and 00/100 ($1,000.00) Dollars covering the present balance of Nine Hundred Seventeen and 73/100 ($917.73) Dollars. A new note and chattel mortgage were executed and the old note and chattel mortgage, executed on February 24, 1965, were stamped "unpaid balance refinanced and included in new note" and returned to the Bankrupt.

A fifth loan refinancing a balance of Eight Hundred Eighty and 43/100 ($880.43) Dollars for a total of One Thousand and 00/100 ($1,000.00) Dollars was executed on April 20, 1966, to the Bankrupt and his wife. A new note and chattel mortgage were executed and the notee and chattel mortgage, executed on August 13, 1965, were stamped "unpaid balance refinanced and included in new note" and returned to the Bankrupt.

During the time which elapsed between the first loan of May 23, 1964, and the last loan of April 20, 1966, no new collateral was advanced by the bankrupt and no other financing statements were filed after the first loan. The Bankrupt was adjudicated on September 29, 1966.

Both parties agree that the transactions come within the purview of the Uniform Commercial Code, effective in Michigan on January 1, 1964.

The issue before the Court is whether a lender remains secured when it perfects its security interest by filing a financing statement on its original loan, makes four subsequent successive loans wherein the balance due on the previous note is refinanced and additional money is loaned, secures a new note and chattel mortgage, marks each previous note and chattel mortgage "unpaid balance refinanced and included in new note," returns the cancelled instruments to the borrower, and does not file a new financing statement for each of the subsequent loans. The referee held that the lender had not perfected its loans and the Court affirmed the referee's decisions in part, holding that the unpaid balance of the first loan was still secured. Household Finance Corporation has now petitioned the Court for a rehearing of its previous ruling and upon further consideration of the cause, the Court reverses itself and the referee and holds that the lender did perfect its security interest.

The Uniform Commercial Code does not expressly cover this situation and it appears to be a matter of first impression in this State.

Section 1102 * of the Uniform Commercial Code provides:

"(1) This act shall be liberally construed and applied to promote its underlying purposes and policies.

"(2) Underlying purposes and policies of this act are

"(a) to simplify, clarify and modernize the law governing commercial transactions;

"(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

"(c) to make uniform the law among the various jurisdictions."

The Official U.C.C. Comment of the National Conference of Commissioners and American Law Institute to Section 1102 states that the code was drawn to make it a semi-permanent piece of legislation.

" * * * It is intended to make it possible for the law embodied in this Act to be developed by the courts in the light of unforeseen and new circumstances and practices. However, the proper construction of the Act requires that its interpretation and ap-

* P.A.1962, No. 174, § 1102, Eff. Jan. 1, 1964.
CL '48, § 440.1102.
M.C.L.A. 440.1102.

M.S.A. 19.1102.
For convenience the Court will cite the code in the same manner as used in the code itself.

plication be limited to its reason." Official U.C.C. Comment, § 1102.

Since this is a matter of first impression in this State, and there is a split of authority in other jurisdictions, we look to the comments and examples of the drafters of the legislation as a guide to construing the policies and purposes of the code.

First of all, it must be determined whether the refinancing or subsequent loans were future advances or separate and distinct transactions. Section 9204 (5) provides:

"Obligations covered by a security agreement may include future advances or other value whether or not the advances or values are given pursuant to commitment."

■■ The Official U.C.C. Comment to this section makes it clear that future advances are valid, provided that they are included in the security agreement. In this case, an examination of the security agreement reveals no provision for future advances. Therefore, the subsequent loans were not future advances. It may be well for lenders in the future to provide future advance clauses when they are likely to engage in refinancing.

Section 1201(37) defines security interest as " * * * an interest in personal property or fixtures which secures payment or performances of an obligation."

Section 9204(1) provides:

"A security interest cannot attach until there is agreement (subsection (3) of section 1201) that it attach, and value is given, and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching."

The Official U.C.C. Comment to Section 9204(1) states:

"Subsection (1) states three basic prerequisites to the existence of a security interest: agreement, value, and collateral. When these three co-exist a security interest may, in the terminology adopted in this Article, attach. Perfection of a security interest will in many cases depend on the additional step of filing a financing statement (see Section 9–302); * * *"

■ For each of the loans, there was value given; there was a written agreement between the lender and debtor; there was collateral and the debtor had rights in the collateral. Therefore, for each of the loans, there was attachment. This leads us to the crux of the case—perfection.

■ Section 9302(1) provides: "A financing statement must be filed to perfect all security interest except the following: * * *." Since none of the exceptions apply to the facts of this case, the secured party had to file a financing statement in order to perfect. It is stipulated that a financing statement was filed by petitioner only after the first loan. The Court held in its previous ruling that it was fatal to the lender not to have filed a financing statement for each of the four subsequent loans. For the reasons which follow, the Court now holds otherwise.

Section 9303(1) provides:

"A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in sections 9302, 9304, 9305 and 9306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches."

■ A fundamental and reiterated policy of the code is that the sequence of the steps necessary for perfection is immaterial. For example, the Official U.C.C. Comment to Section 9303(1) states:

"The term 'attach' is used in this Article to describe the point at which property becomes subject to a security interest. The requisites for attachment are stated in Section 9–204. When it attaches a security interest may be either perfected or unperfected: 'Perfected' means that the secured

party has taken all the steps required by this Article as specified in the several sections listed in the subsection (1). A perfected security interest may still be or become subordinate to other interests (see Section 9–312) but in general after perfection the secured party is protected against creditors and transferees of the debtor and in particular against any representative of creditors in insolvency proceedings instituted by or against the debtor. Subsection (1) states the truism that the time of perfection is when the security interest has attached and any necessary steps for perfection (such as taking possession or filing) have been taken. If the steps for perfection have been taken in advance (as when the secured party files a financing statement before giving value or before the debtor acquires rights in the collateral), then the interest is perfected automatically when it attaches."

For each of the five loans, there was value given; there was a written agreement between the parties; there was collateral and the debtor had rights in the collateral; *and, there was a financing statement describing the collateral.* The only difference in the five loans is that the sequence of the steps necessary to perfect the loans was different after the first loan. In the four subsequent loans, the financing statement was on file before the security interest attached.

Another fundamental and reiterated policy of the code is that it adopted a notice type of filing system. Priorities among conflicting security interest in the same collateral are governed in general by Section 9312, and by Section 9312(5) as it pertains to the facts in this case. The Official U.C.C. Comment to Section 9312(5) states:

"Subsection (5) states rules for determining priority between conflicting security interests in cases not covered in the sections listed in subsection (1) or in subsections (2), (3) and (4) of this section. Note that subsection (5) applies to cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4).

"The operation of subsections (5) and (6) is illustrated by the following examples.

"Example 1. A files against X (debtor) on February 1. B files against X on March 1. B makes a non-purchase money advance against certain collateral on April 1. A makes an advance against the same collateral on May 1. A has priority even though B's advance was made earlier and was perfected when made. It makes no difference whether or not A knew of B's interest when he made his advance.

"The problem stated in the example is peculiar to a notice filing system under which filing may be made before the security interest attaches (see Section 9–402). The Uniform Trust Receipts Act, which first introduced such a filing system, contained no hint of a solution and case law under it has been unpredictable. This Article follows several of the accounts receivable statutes in determining priority by order of filing. The justification for the rule lies in the necessity of protecting the filing system—that is, of allowing the secured party who has first filed to make subsequent advances without each time having, as a condition of protection, to check for filings later than his. Note, however, that his protection is not absolute: if, in the example, B's advance creates a purchase money security interest, he has priority under subsection (4), or, in the case of inventory, under subsection (3) provided he has properly notified A."

There is no indication in the comment that the operation of this example is limited only to future advances although it does seem that Example 4 in the Official U.C.C. Comment to Section 9312(5) is limited to future advances.

Another example of how the code opted for a notice type filing system is in the contents of the financing statement

itself. Section 9402. The Official U.C. C. Comment states:

"This Section adopts the system of 'notice filing' which has proved successful under the Uniform Trust Receipts Act. What is required to be filed is not, as under chattel mortgage and conditional sales acts, the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs. Section 9–208 provides a statutory procedure under which the secured party, at the debtor's request, may be required to make disclosure. Notice filing has proved to be of great use in financing transactions involving inventory, accounts and chattel paper, since it obviates the necessity of refiling on each of a series of transactions in a continuing arrangement where the collateral changes from day to day. Where other types of collateral are involved, the alternative procedure of filing a signed copy of the security agreement may prove to be the simplest solution."

In our previous ruling we relied on the decision of Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co., 3 U.C. C. Reporting Service 112, (Rhode Island Superior Court, April 15, 1966). An important consideration to that court was that the collateral of the debtor could remain tied up by one creditor. We are not convinced that the code was designed or should be interpreted to allow for the capture of a debtor by one creditor.

Such a result we find neither desirable or necessary. Professor Roy L. Steinheimer, Jr., of the University of Michigan Law School, in a commentary on Section 9402, 23 M.C.L.A. 467, makes the following observations:

"As stated in subsection 9402(1), a financing statement may be filed at any time—even before there is a security agreement or before the security interest attaches. The code philosophy is that a simple filed notice to third parties that the secured party and debtor *may* be financing with respect to collateral described in the financing statement should be a 'red flag' warning third parties not to proceed with any financing on the same collateral of the debtor until investigation is made to see that the road ahead has been cleared. Because of the priority given to the first person to file a financing statement under the first-to-file rule of section 9312(5) (a), a second lender must always proceed cautiously before he does any financing of the debtor if there is already a financing statement on file covering the collateral in which he is interested. If there is such a prior filing, the second lender should do one of the following things:

"(a) Insist that the record be cleared by the filing of a termination statement as to the financing statement which is on file. If there is, in fact, no outstanding indebtedness between the first lender and debtor, the debtor can demand such a termination statement (§ 9404). The second lender should not simply rely on the fact that he is satisfied that there is no actual loan outstanding between the first lender and debtor for so long as the first financing statement remains on file any subsequent advance made by the first lender to debtor would be fatal to second lender's rights under the first-to-file priority rule (§ 9312(5) (a)).

"(b) Enter into a subordination agreement with the first lender which appropriately apportions priorities in the collateral (§ 9316).

"A statement of account and list of collateral claimed by the first lender (§ 9208), does not satisfactorily clear the way for the second lender because of the priorities given first lender under the first-to-file rule (§ 9312(5) (a)).

"Because of the priorities under the first-to-file rule (§ 9312(5) (a)), in non-purchase money financing it is desirable to file the financing statement at the earliest possible time and certainly before 'closing the deal'. The lender can establish internal procedures under which the debtor signs a financing statement at the time he applies for a loan so that the financing statement can be filed and a search requested (§ 9407) before the loan is approved and value is given."

In the case of In re Merriman, (United States District Court, Southern District of Ohio, Western Division, No. 1155–D, May 2, 1967), the creditor made three loans to the debtor. Financing statements were filed for the first two, but not for the third. The first two financing statements were not cancelled. In holding that the third loan was also perfected as against the trustee in bankruptcy, Referee Charles A. Anderson stated:

"The determining factor in this case is the fact that the debtors (bankrupt) have continuously owed the same creditor. There has not been a gap in this sequence. The parties have not changed their positions and the collateral has never changed. Under these circumstances, no prospective lien holder, actual or hypothetical could have been prejudiced or misled by the continous duration of a lien."

"In summary, the decision herein is based entirely on a broad purpose of implementing the concept of 'notice filing' where there are not questions of equitable doctrines, such as estoppel or fraud, after inquiry had been made by a party anticipating a security interest. The trustee's lien should rise no higher under the facts, than the rights of an execution creditor if bankruptcy had not intervened."

In conclusion, because the concepts of the code do not require a particular sequence in the steps for perfection and it follows a notice type of filing system, on the facts of this case, the Court is constrained to hold that the lender was perfected for each of its loans. Since the petitioner held a perfected lien before the debtors were adjudicated, the trustee's lien is subordinate to that of the petitioner.

Accordingly, the decision of the referee is reversed, and the Court's prior ruling is reversed. The petitioner may prepare an appropriate order.