**In re the GILCHRIST COM-
PANY, Debtor.**

No. 74–836.

United States District Court,
E. D. Pennsylvania.

Oct. 24, 1975.

**198**

Carl Weiss, Modell, Pincus, Hahn & Reich, Philadelphia, Pa., for debtor.

Marvin Krasny, Adelman & Lavine, Philadelphia, Pa., for receiver.

David T. Sykes, Jared I. Roberts, Duane, Morris & Heckscher, Philadelphia, Pa., Bingham, Dana & Gould, Boston, Mass., for bank.

### MEMORANDUM AND ORDER

LUONGO, District Judge.

On May 30, 1975, Bankruptcy Judge Goldhaber entered an Order in this Chapter XI proceeding ruling that certain financing and continuation statements filed by the First National Bank of Boston (Bank) created and maintained a perfected status for Bank's present security interest in accounts receivable and other assets of the Debtor, Gilchrist Company, as recited in the financing and continuation statements. Gilchrist Company and the Receiver filed the instant appeal.

While this appeal was pending, Gilchrist and its creditors entered into a Plan of Arrangement. The Plan has been confirmed by the Bankruptcy Judge, but an appeal has recently been filed by some creditors from the Order of Confirmation. That appeal is presently pending. In view of the confirmation of the Plan, the Receiver's responsibilities have concluded except for the ministerial role of disbursing to the creditors the funds held by the Court. If, however, the confirmation of the Plan is upset on appeal, the Receiver will be restored to full powers and, in such event, will have an interest in whether these assets are subject to Bank's security interest or not. For that reason, the Receiver remains on the record in this appeal, although he has not participated in the briefing or argument.

The matter presently on appeal before me has been fully briefed by counsel for Gilchrist and for the Bank. Upon consideration of the briefs, oral argument and after careful review of the record before the Bankruptcy Court, I am satisfied that the ruling was correct and the Order appealed from will be affirmed on Bankruptcy Judge Goldhaber's opinion (copy of which is attached hereto) with these few additional comments.

■■ Counsel for Gilchrist points to the fact that the Bankruptcy Judge did not discuss, and therefore urges that he must have failed to consider, two cases cited and relied upon by Gilchrist: *Wilmor Finishing Corp.*, Bankruptcy No. 66–1302 (D.Mass.1968), and *Commerce Union Bank v. Hunley*, 10 UCC Rep.Serv. 1252 (Tenn.Ct.App.1972). Gilchrist contends that *Wilmor* is particularly significant, indeed that it is "binding," since it interpreted Massachusetts law, and the parties here have stipulated that Massachusetts law is applicable. Neither *Wilmor* nor *Commerce Union Bank* affords any basis for upsetting Bankruptcy Judge Goldhaber's well reasoned ruling.

In *Wilmor* the Bankrupt, in 1964, financed the purchase of two pieces of equipment with the lender, who perfected a security interest in the equipment. In 1965, the Bankrupt financed the purchase of three more pieces of equipment with the lender, who perfected a security interest therein. In June 1966, the Bankrupt paid in full the obligation stemming from the 1964 purchase, but did not demand a termination statement from the lender and none was filed. In July 1966, the Bankrupt refinanced the obligation arising under the 1965 purchase, which was then in default. Under the refinancing agreement, the lender was granted a security interest in all five

pieces of equipment, but the lender failed to perfect that security interest because of incomplete filing. The lender then attempted to resort to the 1964 filing to obtain priority over the Trustee. The Bankruptcy Judge, without citation of authority, denied lender's petition to reclaim the three pieces of equipment purchased in 1965, stating only the following:

"Massachusetts General Laws Annotated, Chapter 106, Section 9-404. Termination Statement provides:

(1) Whenever there is no outstanding secured obligation and no commitment to make advances, incur obligations or otherwise give value, the secured party must on written demand by the debtor send the debtor a statement that he no longer claims a security interest under the financing statement, which shall be identified by file number.

If, under these circumstances, the debtor neglects to obtain from the secured party a termination statement, on file with the office of the Secretary of State and the Town Clerk of Bondsville, can it be said that the financing statement which is on file will serve to perfect future security interests under Massachusetts General Laws Annotated, Chapter 106, Section 9-302? I think not."

(See copy of "Findings of Fact [etc.]" at pp. 643-645 of the instant Record on Appeal.)

In light of the above quoted terse "discussion," *Wilmor* is hardly an authoritative statement of Massachusetts law. Moreover, it is distinguisable from the case at bar on at least two grounds. First, the 1964 financing statement covered different collateral than that secured by the 1966 refinancing agreement, whereas in the instant case the collateral was substantially identical. Second, the Bankruptcy Judge, although

acknowledging that "a single financing statement can cover a series of transactions where the parties so intend," found that "there was no intention that [the 1964] contract and financing statement cover any future financing." In the instant case, the financing statement was unquestionably intended to cover a series of future loans. Additionally, the Bankruptcy Judge's ruling in *Wilmor* is particularly perplexing in that he failed altogether to mention the status of the 1965 financing statement. He made no finding that it had been terminated, yet one is left with the distinct impression that it must have been terminated, otherwise the lender's petition to reclaim the three pieces of equipment covered by the 1965 financing statement (which is all the petition sought to reclaim) should have been granted.[1] All in all, even if *Wilmor* is not distinguishable, it is not persuasive and I would not follow it.

In *Commerce Union Bank v. Hunley* one Barlow bought a truck in 1966 with a loan from lender secured by a title lien on the truck. The lien was recorded with the State Motor Vehicle Division and was duly noted on the title certificate. In 1968 Barlow entered into an agreement with lender to borrow an additional sum of money and to refinance the 1966 loan. Barlow signed a new note and new security agreement granting lender a title lien on the truck. Lender returned the original note to Barlow. Lender failed to record the new lien with the Motor Vehicle Division. The truck was later sold at a sheriff's sale on an unrelated judgment against Barlow. The Motor Vehicle Division issued a title certificate to the sheriff's sale purchaser and, by mistake, failed to note thereon the 1966 lien which was still of record. The truck was later resold to defendant. Lender instituted a replevin suit against defendant. The trial court held that, notwithstanding the mistake of the Motor Vehi-

---

1. It is of more than passing interest that, after a Petition for Review of the Bankruptcy Judge's ruling was filed, the Trustee filed a Petition to Compromise lender's claim for fifty percent. The Petition to Compromise was approved. (See p. 642 of the instant Record on Appeal.)

cle Division, defendant took title subject to the 1966 lien. The Tennessee Court of Appeals reversed, holding that lender's surrender of the 1966 note constituted a discharge of that debt and the accompanying lien; that the 1968 transaction was not a renewal of the 1966 loan; and that lender could not assert any interest in the truck under the 1966 lien. The Court stressed that defendant was "a bona fide purchaser for value without actual notice of plaintiff's lien and the fact that defendant had good reason to rely on the certificate of title . . . which . . . showed no liens or encumbrances . . . ." (10 UCC Rep.Serv. at 1257) and concluded that plaintiff had, by its conduct "waived any right which it may have had to enforce its lien to the prejudice of the defendant . . . ." (*Id.* at 1258)

The peculiar combination of circumstances in *Commerce Union Bank* bears no resemblance to the facts in the instant case. Gilchrist is hardly in the position of a "bona fide purchaser" since it was actually aware of Bank's secured position. Gilchrist, of course, claims the shelter of the Receiver's, rather than its own, position with respect to knowledge and notice. But even granting to the Receiver the status of an ideal lien creditor, he is only entitled to that status "as of the date of bankruptcy." (§ 70(c) Bankruptcy Act, 11 U.S.C. § 110(c) Supp. 1975). On the date Gilchrist filed its Petition for Arrangement, Bank's loans to Gilchrist were in fact on a secured basis. The recorded financing and continuation statements put the Receiver on inquiry notice and, had he inquired, he would have ascertained that the loans were then secured. In *Commerce Union Bank,* the absence of notation on the title certificate appears to have borne great weight with the Court. We have nothing comparable in the instant case. Unlike the purchaser there, who had "good reason to rely on the certificate of title," the Receiver was only entitled here to rely on the financing statements recorded in the appropriate offices.

The Bankruptcy Judge's Order will be affirmed.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue before this court arises out of a Complaint, filed by the First National Bank of Boston ("Bank"), to determine the validity of its security interest in the accounts receivable and related collateral of the Gilchrist Company ("Gilchrist"). Gilchrist, which operates department stores in Boston, Massachusetts, and its suburbs, filed a proceeding for an arrangement under Chapter XI of the Bankruptcy Act on September 27, 1974. The proceeding was filed in this district (the Eastern District of Pennsylvania) under the "affiliate" rule: Rule 116(a)(4), Gilchrist's parent (Uni-Shield International Corp.) having previously filed a similar petition in this district. Both the receiver and Gilchrist oppose the Complaint, both contending that the bank has no perfected security interest in any of the Debtor's assets.

The facts are undisputed. The Bank had, from time to time, loaned money to Gilchrist since 1955. On November 25, 1959, the Bank filed financing statements covering "installment accounts, revolving accounts and other accounts receivable owing by customers of the Debtor . . . all conditional sales contracts, security agreements, notes and other papers evidencing the same." These financing statements were continued in effect by the timely filing of Continuation Statements to the present time.

On February 11, 1972, the nature of the financing of Gilchrist by the Bank was changed in that, from that date to February 22, 1974, all loans from the Bank were unsecured. In late 1972, all loans had been repaid in full by Gilchrist. However, the Bank never terminated its

previously filed financing statements, nor did Gilchrist ever request it to do so.

On February 22, 1974, the Bank and Gilchrist entered into a new loan agreement (the "1974 agreement") under the terms of which the Bank is owed approximately $3,100,000.00, and under which Gilchrist granted the Bank a security interest in all of its accounts receivable, then existing or thereafter arising, and the proceeds thereof. No new financing statement was filed by the Bank.

All of the parties have agreed that the issues raised in this proceeding are to be decided under Massachusetts law.

 There is no question but that the 1974 agreement created a valid security interest as between Gilchrist and the Bank. The only issue is whether that security interest was perfected by the existence of record of a financing statement, first filed in 1959 and kept current by timely filed Continuation Statements, filed at regular intervals (in each case just short of five years). Such statements show Gilchrist as the debtor, the Bank as the secured party, and Gilchrist's accounts receivable as the collateral.

The financial dealings between Gilchrist and the Bank over the years reflect periodic increases and periodic reductions of loan balances, with intervals when there was no outstanding balance at all. During the periods when Gilchrist owed the Bank nothing there existed, not an unperfected security interest, but, rather, no security interest at all. When, however, advances were subsequently made, the security interest arising therefrom was automatically perfected. There is no authority for the proposition that a period of zero balance lasting a day, a week, or even several years in any way impairs the effectiveness of a continued filing with respect to advances subsequently made, as long as the parties intend those advances to be secured.

It is clear that, from 1972 to February 22, 1974, the parties did not intend the Bank's loans to be secured. And, during that period, as in the previous periods of zero balance, there was not an unperfected security interest, but no security interest at all. But when the parties entered into the 1974 agreement, wherein Gilchrist again gave the Bank a security interest in certain of its assets, the previously filed financing statements, methodically maintained in full force and effect by the timely filing of Continuation Statements, gave the new advances the same secured status as applied to the pre-1972 loans. Any party searching the records as to the possible existence of a security interest in Gilchrist's accounts receivable would have found the original financing statements and the continuation statements. This would be enough to cause inquiry to be made from the Bank to determine the status of any loan. This is the very purpose of the "notice filing" required by Section 9–402(1) of the Uniform Commercial Code ("Code"). In Official Comment 2 to Section 9–402, the draftsmen noted that the security agreement itself need not be filed, but a mere notice indicating "merely that the secured party who has filed *may* have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs. . . ."

The Bank relies on the provisions of the Code and a line of cases beginning with *James Talcott, Inc. v. Franklin National Bank of Minneapolis*, 292 Minn. 277, 194 N.W.2d 775. In this leading case, the plaintiff ("Talcott"), in making a loan to a borrower for the purchase of two trucks and some other construction equipment, had described the collateral, in the financing statement, as "construction equipment; motor vehicles." Talcott filed that financing statement and subsequently the same borrower granted to the defendant ("Bank") a security interest in three other trucks and equipment, delivered under a lease ("leased equipment"). Then the borrower and Talcott executed an extension agreement ("second security agreement") in which the borrower granted Talcott a security interest in the leased equipment. No additional financing

statement was filed in connection with the second security agreement. When Talcott brought an action to recover the lease equipment from the Bank, which had repossessed it under the terms of its lease, the lower court sustained the Bank's position that Talcott's security interest in the equipment covered by the second security agreement was not perfected because of Talcott's failure to file an amendment to the financing statement. The Supreme Court of Minnesota reversed, noting that the original financing statement "was sufficient to give notice of the security agreement entered into on February 20, 1968, and was also sufficient to give notice of the second security agreement of January 30, 1969. . . ." The Court referred to the authorization, contained in Section 9–402 (1) of the Code, permitting the filing of financing statements even before a security agreement is made, and to the fact that the Code does not require a reference in the financing statement to after-acquired property. Said the Court, "The whole purpose of notice filing would be nullified if a financing statement had to be filed whenever a new transaction took place between the secured party and the debtor. Once a financing statement is on file describing property by type, the entire world is warned, not only that the secured party may already have a security interest in the property of that type (as did plaintiff in the property originally financed), but that it may later acquire a perfected security interest in property of the same type acquired by the debtor in the future. When the debtor does acquire more property of the type referred to in the financing statement already on file, and when a security interest attaches to that property, the perfection is instantaneous and automatic. . . ."

The Court continues: "Upon a review of decision law in other jurisdictions it would appear that there is a difference of opinion as to perfection and priority of a later advance where it was not made pursuant to the original security agreement but pursuant to a later agreement which may or may not have satisfied the requirements of the Code as to security agreements. The better view holds that, where originally a security agreement is executed, an indebtedness created, and a financing statement describing the collateral filed, followed at a later date by another advance made pursuant to a subsequent security agreement covering the same collateral, the lender has a perfected security interest in the collateral not only for the original debt but also for the later advance. The instant matter involves a parallel situation. See *In re Rivet*, 299 F.Supp. 374 (E.D.Mich. 1969)." 194 N.W.2d at 784.

Summarizing, *Talcott*, and the line of cases which follow its concept, hold that a duly filed financing statement, showing the same debtor, the same secured party, and the same collateral, serves to perfect a security interest created in a transaction other than that for which the financing statement was originally filed.

On the other hand, Gilchrist and its receiver rely on a line of cases lead by *Coin-o-Matic Service Co. v. Rhode Island Hospital Trust Co.*, 3 UCC Rep. 1112 (Superior Ct., R.I.), which seem to require a new financing statement for every new transaction, despite the prior filing of a financing statement showing the identical debtor, secured party and collateral. Applying this principal to the instant case, it would have meant that, in February, 1974, the Bank would have been required to file a new financing statement in which it would have given notice to the world that it might claim a security interest in Gilchrist's receivables,— a fact already apparent from the then existing record. We think that *Coin-o-Matic* and the cases which follow it: *In re Hagler*, 10 UCC 1285 (Ref.E.D.Tenn.), *In re Merrimen*, 4 UCC Rep. 234 (Ref. S.E.Ohio), are factually distinguishable from the case at bar; but, even if they were not, we reject their rationale.

The Review Committee for Article 9 of the Permanent Editorial Board for the Uniform Commercial Code, in its Final Report in 1971 with respect to proposed amendments to the Code, considered the *Coin-o-Matic* line of cases, stating, "The Committee disapproves this line of

cases, and believes that an appropriate financing statement may perfect security interests securing advances made under agreements not contemplated at the time of the filing of the financing statement, even if the filing of the advances then contemplated have been fully paid in the interim. Under the notice-filing procedures of the Code, the filing of a financing statement is effective to perfect security interests as to which the other required elements for perfection exist, whether the security agreement involved is one existing at the date of the filing with an after-acquired property clause or a future advance clause, or whether the applicable security agreement is executed later . . .

"The Committee considered drafting a provision emphasizing its disagreement with the *Coin-o-Matic* line of cases, but concluded that the existing Code is clear enough, and should not be disturbed just to overrule some lower court cases. The *Rivet* case cited by the First Circuit has since been reversed by *In re Rivet*, 6 UCC Rep. 460 (E.D.Mich.1969)." *Final Report* at 226–7.

We also note that White and Summers, in their treatise on the Uniform Commercial Code, have this to say about the *Coin-o-Matic* concept: "We reject the *Coin-o-Matic* holding for three reasons. First, it provides little protection against overrreaching, for a creditor can avoid the holding simply by including a future advance clause in its security agreement. Second, we suspect that the *Coin-o-Matic* court misunderstands commercial practice. We suspect that it is a rare banker who will lend against the same collateral which secures a prior loan; in our experience the commercial practice is for the second lender to pay off the first and so take a first priority as to all the collateral. Finally, *Coin-o-Matic* conflicts with the most obvious and we think intended meaning of 9–312(5)(a); if the draftsmen had wished to qualify the rule as the *Coin-o-Matic* court did, they could have done so. In summary it appears that *Coin-o-Matic* may have been aberrational, for other

courts have not followed it. A cautious lawyer can protect himself even in Rhode Island by providing for subsequent advances in his security agreement." White & Summer, *Uniform Commercial Code,* Section 25–4(1972).

As we have indicated heretofore, even if we accept the *Coin-o-Matic* approach, on the distinguishable facts of that case the same result is not compelled here. In *Coin-o-Matic,* the original transaction was a purchase money security interest which is obviously limited to the purchase price. The subsequent transaction was a loan secured by property already owned by the debtor. In the case at bar both the original and subsequent transactions were loan agreements contemplating future advances, fluctuating loan balances and collateral consisting of a constantly changing pool of receivables.

Both Gilchrist and the receiver suggest that the unsecured condition of the loan between 1972 and 1974 somehow gives the receiver some rights under Section 70c of the Bankruptcy Act. We find this suggestion to be completely without merit. While one might envision a situation in which a creditor, for some reason, might have been misled during the period in question under circumstances that would create an estoppel against the Bank. But there is no evidence that such a creditor exists. And the fact that the receiver became a lien creditor on the date of the filing of the Chapter XI petition on September 27, 1974, gives him no rights prior thereto: *Lewis v. Manufacturers National Bank of Detroit,* 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323. Section 70c gives the receiver the status of a hypothetical creditor *as of the date of the filing of the proceeding.* On that date, the Bank had a security interest in Gilchrist's accounts receivable which came into being in February, 1974, and which, for the reasons heretofore expressed in this opinion, had been continuously perfected since that time. To accept the construction suggested by Gilchrist and the receiver would enrich Gilchrist at the expense of the Bank, as Mr. Justice Douglas put it

in *Lewis,* "creating a windfall merely by reason of the happenstance of bankruptcy."

### ORDER

And now, to wit, this 30th day of May, 1975, after hearing, it is

Ordered and decreed that

(1) The First National Bank of Boston has a present and continuous perfected security interest in the accounts receivable and other collateral of The Gilchrist Company as appears in the financing and continuation statements attached to the Complaint filed herein;

(2) The financing statements filed in November 1959, and continued in October 1964, September 1969, and August 1974, constitute a continuing perfected status for any outstanding security interest of The First National Bank of Boston in the accounts receivable and related collateral of The Gilchrist Company, as specified in said financing statements;

(3) The Gilchrist Company and its receiver shall give full and complete recognition to the perfected status of the security interest created by the Loan and Security Agreement, dated February 22, 1974, as executed by The Gilchrist Company and The First National Bank of Boston.