**In the Matter of Pilar Cordova ANTUNA, d/b/a Atlas Grain Co., Bankrupt.**

**AMERICAN NATIONAL BANK, Plaintiff,**

v.

**James H. THOMPSON, Jr., trustee in bankruptcy, Defendant.**

**Bankruptcy No. 77–60326–B–SJ.**

United States Bankruptcy Court, W. D. Missouri, St. Joseph Division.

Jan. 2, 1980.

R. Dan Boulware, Gregory Lucas, St. Joseph, Mo., Daniel Dibble, Kansas City, Mo., for plaintiff.

James H. Thompson, Jr., Kansas City, Mo., for defendant.

## ORDER DENYING PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT AND ALSO DENYING DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT

DENNIS J. STEWART, Bankruptcy Judge.

The court of bankruptcy formerly entered its judgment herein finding the plaintiff to have a valid and perfected security interest in certain of the accounts receivable of the bankrupt and finding further that the attaching of the security interest to certain accounts receivable which first came into existence within four months of bankruptcy was not preferential. The amount of recovery from the estate, however, was limited to the proceeds of the accounts receivable which could actually be traced into the estate in bankruptcy.

Now pending before the court of bankruptcy are two motions to alter or amend the judgment thus rendered: one by the plaintiff, based upon the basic contention that the judgment should not have been so limited and one by the defendant, who requests that the court make a finding that the plaintiff was possessed of such knowledge when the transfers were made within four months of bankruptcy that it had a duty to inquire into the question of the bankrupt's solvency *vel non*.

The plaintiff's contention is that, by virtue of a general security interest which it purported to take in all existing and future accounts receivable in a line-of-credit agreement dated May 18, 1976, it had a valid and perfected security interest in all the accounts receivable of the bankrupt, both those in respect of which no specific security interest was later taken and others as well. Thus, it is contended that, even if the plaintiff is to be deprived of the proceeds of those security interests collected prior to the date of bankruptcy, it should be granted the proceeds of other accounts receivable which fall within the general description of the May 18, 1976, agreement and the financing statements filed in connection therewith.[1] The trouble with this argu-

---

1. The judgment herein challenged, issued on August 27, 1979, in finding that no balance was due under the security agreement of May 18, 1976, nevertheless granted the plaintiff ten days in which to show that some balance was due. Within the time thus allotted, the plaintiff in substance moved to alter or amend the judgment by contending that "(t)he May 18, 1976 Security Agreement does secure all future advances as it provides that such security interest is to secure the payment of debtor's obligations of Loan Agreement No. 1602, 'together with *all other debts heretofore or hereafter due or owing secured party by debtor* and all other present or future, direct or indirect liabilities, or contingent liabilities of debtor to secured party of any nature whatsoever and interest on all of the above, and all costs and expenses incurred in the collection of the same and in the enforcement of the secured party's rights hereunder.'" (Emphasis added by plaintiff.) The primary statutory reliance of the plaintiff in this regard is upon section 400.9–204(5) RSMo which pertinently provides that "obligations covered by a security agreement *may* include future advances or other value whether or not the advances or value are given pursuant to commitment." The matter is still one which is one of intent between the contracting parties, however, as manifested by the terms of the writings in issue or, in an appropriate case, by extrinsic evidence. See *Hancock County Bank v. American Fletcher National Bank & Trust Co.*, 150 Ind.App. 513, 276 N.E.2d 580 (1971). In that case, it was held that, if the parties manifest an intention that a security agreement is not to cover subsequent advances, that manifested intention must prevail. "The true intention of the parties is really the sole and controlling factor in determining whether the future advances were covered by the original agreement." *Kimbell Foods, Inc. v. Republic Nat. Bank of Dallas*, 401 F.Supp. 316, 325 (N.D.Tex. 1975), reversed on other grounds, 557 F.2d 491 (5th Cir. 1977), affirmed in part and vacated in part on other grounds, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). The rule that "the intent of the parties at the time of such later advances or loans has no bearing upon whether they are subject to the security interest arising under a previous agreement," *Barksdale v. Peoples Financial Corp. of Alpharetta*, 393 F.Supp. 112, 119 (N.D.Ga.1975), must necessarily apply only when the parties subsequently manifest no intention, either by the unambiguous terms of a subsequent agreement or otherwise by extrinsic evidence of such intention not to apply the same collateral to a subsequent loan. *Hancock County Bank v. American Fletcher National Bank & Trust Co., supra*. Otherwise, the fundamental law of contracts would be violated. "Generally, those who make a contract may unmake it or substitute another, either wholly or partially consistent, and if the second contract be valid it will supersede or modify the

ment is that the plaintiff did not extend any credit to the bankrupt after May 18, 1976, except in connection with other security agreements, under the terms of which plaintiff negated any intent to take a security interest generally in accounts receivable by taking security interest only in specifically described accounts receivable.[2]

■ Thus, its contention that the agreement of May 18, 1976, must, in the end, stand paramount clashes head-on with the fundamental contract doctrine that the subsequent, more specific expression of intention of the parties controls over the prior, more general expression.[3] This is particularly so when, as in the case at bar, the subsequent expression unambiguously contradicts the prior expression by purporting clearly to take a security interest, not in all accounts receivable existing and future, but only in certain existing accounts receivable.[4]

■ Furthermore, to indulge the argument of the plaintiff would not only violate fundamental contract law, but would also be particularly pernicious in the context of pre-bankruptcy transfers such as are in issue here. For purporting to take security agreements and interests only with respect to certain accounts receivable, in plain derogation of a prior agreement, may well encourage lending by other creditors who depend upon the existence of the other, apparently released accounts receivable for security or for assurance otherwise that the ability exists to repay the debt. But, if the plaintiff may then, after bankruptcy, turn about and rely upon its general, but apparently repudiated, agreement, the preference situation is exacerbated, with the initial, seemingly repudiating, creditor in substance receiving the monies of the later creditors

first to the extent that the two cannot stand together." *Ragan v. Schreffler*, 306 S.W.2d 494, 498 (Mo.1957). In this case, the intention of the parties clearly expressed in the subsequent agreements is *not* to apply all of the accounts receivable as collateral, but rather only that which is therein specifically described. In all of the subsequent agreements here in issue, the American National Bank, on its own pre-printed form, purports to take a security interest only in "the following property and all proceeds thereof," whereupon the descriptions of the accounts receivable by invoice number are set out. Nowhere in the copies which have been supplied to the court do the parties purport to preserve a security interest in all existing and future accounts receivable. In this respect, the case at bar is readily distinguishable from those relied upon by the plaintiff, in which there was no subsequent security agreement, but rather only one general agreement prior to the extension of credit, *In re Lawrence Peska Associates, Inc.*, 5 Bankr.Ct.Dec. 278, 280 (S.D.N.Y.1979); or the subsequent security agreement completely described as collateral those articles which were originally taken as security in the initial, general agreement, *In re Gilchrist Company*, 403 F.Supp. 197 (E.D.Pa. 1975), affirmed, 535 F.2d 1246 (3d Cir. 1976); or the original agreement revealed "no provision for future advances," but the subsequent agreements sufficiently covered it, *In re Rivet*, 299 F.Supp. 374 (E.D.Mich.1969); or no subsequent agreement "called a halt to advances" under the original agreement. *In re Cichanowicz*, 226 F.Supp. 288, 291 (E.D.N.Y.1964). In

this case, however, the subsequent contracts so plainly limited the collateral which was taken that the provisions of the general agreement of May 18, 1976, must be deemed to have been waived with respect to these transactions. "Whatever may have been the parties' original agreement, it was competent for them . . . to waive, dissolve or abandon that contract and substitute a new . . . contract by conduct and intimation, as well as by express words." *Pallardy v. Link's Landing, Inc.*, 536 S.W.2d 512, 515 (Mo.App.1976).

**2.** See note 1, *supra*. Further, in the action at bar, if the subsequent contracts between the parties do not suffice to achieve the waiver of the general contents of the original contract of May 18, 1976, the extrinsic evidence on that subject does. For, as noted in the text of this memorandum, the bank officer who testified in the hearing of this matter stated that the bank limited its concern to the existence of the specific invoices (accounts receivable) listed in the subsequent agreements and did not concern itself with any general question of solvency *vel non*.

**3.** "(G)eneral terms and provisions of a contract yield to specific ones." *State ex rel. Smith v. City of Springfield*, 375 S.W.2d 84, 91 (Mo. en banc 1964).

**4.** See note 1, *supra*.

(secured or unsecured [5]) in addition to the repayment of its own which the law allows.[6]

These principles fit the material facts of the action at bar, in which the plaintiff's loan officer, in the course of his testimony herein, explicitly stated that, in making the security agreements within four months of bankruptcy, he relied, on the bank's behalf, *only* upon the existence of the accounts receivable expressly described and enumerated (by account number) therein. Indeed, it was by means of this testimony that the plaintiff sought to defend the contention that it had reasonable grounds to believe the bankrupt insolvent at the time that it made the loans to him shortly prior to bankruptcy. The bank was unconcerned, the bank officer testified, with the general balance sheet of the bankrupt (and hence with the bankrupt's solvency *vel non*) because it believed itself to be adequately protected by the existence of those accounts receivable, and only those, in which it, in the latter security agreements, purported to take specific security interests.

Now, however, it is clear that the bankrupt, prior to his taking bankruptcy, did not pay over the proceeds of those accounts receivable which he collected prior to bankruptcy to the plaintiff.[7] Therefore, the plaintiff currently proposes to rely upon its prior, general security agreement. By virtue of the foregoing considerations, however, plaintiff cannot have it both ways. If it really did rely upon all existing and future accounts receivable, it certainly had reasonable grounds to believe the debtor to be insolvent at the time it made the loans within the four-month period next preceding the date of bankruptcy. For the bankrupt's accounts receivable constituted the greater part of the existing unencumbered assets of the bankrupt.[8] And even the most superficial comparison of their value with existing liabilities, most of which were made known to the plaintiff in prior financial statements,[9] would have shown the bankrupt to be insolvent.[10]

But the bank retreated from any reliance upon all the existing and future accounts receivable under circumstances which indicate that the retreat was for the purpose of avoiding any direct knowledge of the solvency or insolvency of the bankrupt. Thus, even while it granted successive loans to the bankrupt at an unprecedented rate, it refused to look into the financial circumstances which prompted the requests for such loans and even eschewed its former practice of taking financial statements from the bankrupt.[11] This closing of the eyes [12] to the actual financial condition of the bankrupt was justified by the bank officer on the grounds that he need only look to the accounts receivable specifically described in the later security agreements.

---

5. It is as necessary to the perfection of a security interest that the security agreement itself contain an adequate description of the collateral as it is for the financing statements to contain an adequate description of it. See 4B Collier on Bankruptcy para. 70.62A(3.1), p. 701 et seq. (1978). Thus, an unsecured creditor may well have extended credit relying upon a general picture of ability to repay, just as a secured creditor might feel comfortable in lending money and taking as security all other accounts receivable except those specified in the subsequent agreements.

6. See note 5, *supra.*

7. This has been detailed by the court in the challenged judgment and in the orders entered antecedent thereto. Whether the nonpayment of the proceeds of accounts receivable to the lienholder may constitute a willful and malicious conversion for which a decree of nondischargeability might be proper under section 17a(2) of the Bankruptcy Act is a question which can be answered only upon the filing of a proper complaint seeking such a decree.

8. The schedules reveal that the $340,000 in receivables due from International Grain Elevator Corporation constituted almost all of the assets of the bankrupt, while the outstanding debts exceeded $1 million.

9. The bank officer testified that prior financial statements had been required of the bankrupt, but that it had not required one within the last year prior to the date of bankruptcy.

10. See note 8, *supra.*

11. See note 9, *supra.*

12. In its attempts to avoid being the conferee of a preference, "a creditor may not wilfully close his eyes that he might remain in ignorance of his debtor's condition." 3 Collier on Bankruptcy para. 60.53, p. 1063 (1977).

It is difficult to imagine any clearer statement, under these circumstances, of an intention to repudiate the former general security agreement.[13] Cf. *Gateway Aviation, Inc. v. Cessna Aircraft*, 577 S.W.2d 860, 862 (Mo.App.1978).

■ In thus accepting the testimony of plaintiff's loan officer to the effect that value was given [14] only under the restrictive terms of the security agreements made subsequent to and in derogation of the general one of May 18, 1976, the court has reached the only result which might be reached. For, even if the loan officer's testimony is to be discarded in favor of plaintiff's present contention that it gave value under the general agreement and that it intended not to repudiate that general agreement, it thereby succeeds only in charging itself with knowledge of a sufficiency large portion of the bankrupt's financial situation to have had reasonable grounds to believe the bankrupt insolvent. Thus, in respect to all the proceeds of accounts receivable in the estate, any recovery would constitute a preference—except, again, for the proceeds of accounts receivable explicitly described in the later agreements, for the security interests in which new value was contemporaneously given.[15]

■ For the foregoing reasons, the motion of plaintiff to alter or amend the court's prior judgment must be denied. The cases and authorities relied upon by plaintiff to the general effect that a prior security agreement may cover subsequent advances do not apply to a situation like that at bar, in which the subsequent advances are given pursuant to agreements which contradict and repudiate the prior security agreement.[16] Agreements under which security purports to be taken for other than the primary obligation therein reflected "are not favorites of equity, and . . . they will be construed rather strictly . . . [lest the] broad and general terms . . . enwrap the unsuspecting debtor in the folds of indebtedness . . . which he did not contemplate." *National Bank of Eastern Arkansas v. Blankenship*, 177 F.Supp. 667, 673 (E.D.Ark. 1959).[17] The rule is particularly applicable when, as in the case at bar, a subsequent agreement, by virtue of its specificity, rules out the application of the prior general agreement.

## II

■ The motion of the defendant to alter or amend the court's judgment requests that the court make a specific finding that, although the plaintiff may not have had reasonable grounds to believe the bankrupt to be insolvent, it nevertheless had sufficient information to give rise to a duty to inquire within the meaning of recent Eighth Circuit cases.[18] The motion must be

---

13. See *Pallardy v. Link's Landing, Inc., supra* note 1.

14. A "security interest cannot attach until there is agreement . . . that it attach and the debtor has rights in the collateral." Section 400.9–204(1) RSMo.

15. An indispensable element of a preference is that the transfer be in payment for an *antecedent* debt. See section 60 of the Bankruptcy Act.

16. See note 1, *supra*.

17. As noted above in the text of this memorandum, this consideration is of special importance when the rights of other creditors are involved, as well as those of the parties. See note 5, *supra*.

18. "The act requires neither actual knowledge of nor belief in the debtor's insolvency. All that is necessary is a reasonable cause to believe the debtor is insolvent. A creditor's mere apprehension or suspicion that the debtor is suffering financial reverses and may be insolvent is insufficient . . . It is clear, however, that a creditor may not ignore a debtor's precarious state of affairs. When circumstances exist that would incite a prudent business person to inquire into the debtor's affairs, a creditor who refuses or neglects to do so will be charged with notice of all facts a reasonably diligent inquiry would have disclosed." *Green v. A. G. Edwards & Sons, Inc.*, 582 F.2d 439, 443 (8th Cir. 1978); *Matter of PRS Products, Inc.*, 574 F.2d 414, 417 (8th Cir. 1978) (When a bank could require a financial statement and there is other indication of precarious financial circumstances, it is charged with a duty to inquire.).

denied for two reasons: (1) it has been filed out of time and without leave of court or any prior extension of time, and (2) it is superfluous and unnecessary. The court, in finding that, but for the decision of the district court in *In re Citizens Loan and Savings Company*, Civil Action No. 78–6024–CV–SJ (W.D.Mo. May 29, 1979), which appeared to abolish in this district the "duty to inquire" rule, all the elements of a preference would have been present,[19] sufficiently found that a duty to inquire existed in this case if the doctrine were still current. It further observed that there was evidence which would have supported that finding.[20] Such a finding is not therefore necessary to be made by way of alteration or amendment of the judgment.

It is therefore, for the foregoing reasons,

ORDERED that plaintiff's motion to alter or amend the court's prior judgment herein be, and it is hereby, denied. It is further

ORDERED that defendant's motion to alter or amend the court's prior judgment herein be, and it is hereby, denied.

---

19. In the judgment of August 27, 1979, this court specifically found, *inter alia*, that "the bank's declining to make inquiry because it regards itself adequately protected by specific security interests cannot insulate it from the duty to inquire."

20. The court found, *inter alia*, that "although the bankrupt had been arguably solvent on June 30, 1977, even according the bankrupt's assets the most in value that can reasonably be accorded them did not leave the matter wholly free of question. For, even given the greatest value accordable to the assets, they did not greatly exceed the bankrupt's liabilities. When the bankrupt, then, evidenced in September and October 1977, an unusual need for frequent loans, it would appear that it should have reasonably been placed on inquiry as to the financial condition of the bankrupt, which was clearly one of insolvency by this time."