John D. Bennett, J.
In this accounting proceeding the *478 objectant, Mary Gruder, a general creditor of the estate, challenges the payment of debts by the estate to the respondent bank in preference to the other creditors of the estate in violation of SCPA 1811 (subd 3). The bank contends that it was a preferred creditor and that the satisfaction of the debts was not a violation of SCPA 1811 (subd 3).
In August of 1966 decedent entered into an agreement with the respondent bank which consolidated certain outstanding unsecured loans into a new obligation under which the bank advanced additional money. The new obligation was evidenced by a note signed by the decedent in the amount of $25,000. It was secured by the assignment to the bank of decedent’s contract rights to receive monthly proceeds from Work Wear of N.Y., Inc. (Work Wear). The bank thereupon filed financing statements regarding the security interest it had in the assigned contract.
The contract rights assigned to the bank provided for payment of $1,785.71 per month for some 84 months to the decedent. Testimony of the bank’s vice-president in charge of loans has established that some $750 to $800 of the monthly installments due under the assignment were credited to the 1966 loan and the balance was deposited into the decedent’s account. The exact figure of the monthly payment due on the note was contained in the original note, which was returned to the decedent upon execution of two new notes in 1967 incorporating the balance of the 1966 note and adding to that additional advances.
On March 7, 1968 decedent entered into another agreement with the bank which incorporated the 1967 loans and included additional advances to the full extent of the remaining Work Wear contract proceeds — $83,928.27. The bank returned the 1967 note to decedent upon execution of the 1968 note. The 1968 note contained a clause indicating that "[t]he bank is hereby given a lien for the amount of all liabilities, claims and obligations, including this note, whether absolute or contingent, now existing or hereafter arising, secured, or unsecured, due or not due, joint or several, upon any chattel or other property on which the bank has or will hereafter acquire a lien or mortgage, and upon the title or interest of the undersigned, or any of them, in any other property and/or security left with the bank for safe keeping, custody or otherwise or coming into possession of the bank in any way.”
The monthly installment due under the 1968 note was equal *479 to the monthly installment due under the Work Wear contract. The bank applied the Work Wear installments directly toward the 19¡68 loan until January, 1971, when the assigned rights terminated and the loan was satisfied.
Additionally, a $15,000 life insurance policy with Connecticut General Life Insurance on the decedent’s life named the bank as beneficiary as further security for the loan advanced. The proceeds of this policy which were paid to the bank were applied as follows: $9,333.60 to the debt allegedly secured by the Work Wear contract; $3,910.71 to a loan under which decedent was contingently liable as guarantor or indorser, the principal obligor being his wife, Sydell Gruder; $1,730.69 to a loan under which decedent was indorser or comaker, and a Mr. Wolfson the principal obligor; and $25 for late charges on one of the loans. Evidence has been presented indicating that the Sydell Gruder loan and the Wolfson loan were accelerated upon the death of the decedent.
Decedent had also assigned a $10,000 life insurance policy from Guardian Life to the bank to secure an alleged additional $10,000 loan to the decedent which the objectant claims has not been established.
Article 9 of the Uniform Commercial Code applies to security interests created by assignment (Uniform Commercial Code, § 9-102, subd [2]) and contract rights may be the subject matter of a security interest (Uniform Commercial Code, § 9-102, subd [1], par [a], 9-106). In addition the assignment together with the evidence establishing the existence of the notes fulfills the requirements of a security agreement (Matter of Wambach v Randall, 343 F Supp 73, affd 484 F2d 572).
The objectant’s major argument is that the bank was not a secured creditor of the deceased at the time of his death because the 1966 loan was paid in full prior to the 1968 loan. She asserts in her posttrial memorandum that the bank was required to produce the original note under the best evidence rule which would have revealed what portion of the Work Wear assignment was to be credited toward the loan, and that since this was not done the assignment is absolute on its face and the full $1,785.71 per month was required to be applied towards payment of the 1966 note. In substance the objectant’s position is that the 1966 loan was satisfied and the assignment and financing statement lapsed, all prior to the 1968 note. That being so, the assignment was not in the possession of the bank at the execution of the 1968 loan and *480 could not have secured such loan. Additionally the objectant also contends that the bank should have applied all of the proceeds of the Connecticut General Life insurance policy to the decedent’s loan and that the proceeds of the Guardian Life policy should be returned to the estate.
At the hearing objectant did not object to any portion of the bank’s testimony regarding the notes. The objection based on the best evidence rule, raised for the first time after trial, must be deemed waived if not made at the time the testimony is offered (Hecla Powder Co. v Sigua Iron Co., 157 NY 437).
There exists a line of cases which would support the objectant’s contention that the Work Wear contract cannot be deemed to be security for the 1968 note if the agreement of the parties did not provide for future advances. The leading case is Coin-O-Matic Serv. Co. v Rhode Island Hosp. Trust Co. (3 UCC Rep Serv 1112 [RI Super Ct]). There the court held that (p 1120): "a security agreement which does not provide for future advances is a single transaction and in the case of subsequent security agreements there is required a new financing statement. That is to say, a single financing statement in connection with a security agreement when no provision is made for future advances is not an umbrella for future advances based upon new security agreements, notwithstanding the fact that involved is the same collateral.” (See, also, Safe Deposit Bank and Trust Co. v Berman, 393 F2d 401; Marine Midland Bank v Conerty Pontiac-Buick, 77 Misc 2d 311, 317.)
The review committee for article 9 of the permanent editorial board for the Uniform Commercial Code (Amer Law Inst [1971]), in its final report expressed its displeasure with the Coin-OMatic line of cases. They stated: "The Committee disapproves of this line of cases, and believes that an appropriate financing statement may perfect security interests securing advances made under agreements not contemplated at the time of the filing of the financing statement, even if the advances then contemplated have been fully paid in the interim. Under the notice-filing procedures of the Code, the filing of a financing statement is effective to perfect security interests as to which the other required elements for perfection exist, whether the security agreement involved is one existing at the date of the filing with an after-acquired property clause or a future advance clause, or whether the applicable security agreement is executed later * * *
*481 "The Committee considered drafting a provision emphasizing its disagreement with the Coin-O-Matic line of cases, but concluded that the existing Code is clear enough, and should not be disturbed just to overrule some lower court cases.” (Final Report, pp 226-227.)
Summers and White, in their treatise, indicate: "We reject the Coin-O-Matic holding for three reasons. First, it provides little protection against overreaching, for a creditor can avoid the holding simply by including a future advance clause in his security agreement. Second, we suspect that the Coin-O-Matic court misunderstands commercial practice. We suspect that it is a rare banker who will lend against the same collateral which secures a prior loan; in our experience the commercial practice is for the second lender to pay off the first and so take a first priority as to all of the collateral. Finally, Coin-O-Matic conflicts with the most obvious and we think intended meaning of 9-312(5)(a); if the draftsmen had wished to qualify the rule as the Coin-O-Matic court did, they could have done so.” (White and Summers, Uniform Commercial Code, p 908.)
Other courts have more logically held that the secured party remains continuously secured from the time the original financing statement is filed despite several refinancings and the absence of a provision for future advances (Matter of Rivet, 299 F Supp 374; Matter of Merriman, 4 UCC Rep Serv 234; Index Store Fixture Co. v Farmers Trust Co., 19 UCC Rep Serv 284; Matter of Gilchrist Co., 403 F Supp 197).
In James Talcott, Inc. v Franklin Nat. Bank of Minneapolis (292 Minn 277, 291-292), the court summarized the commercial reasonableness of notice filing by indicating: "The better view holds that, where originally a security agreement is executed, an indebtedness created, and a financing statement describing the collateral filed, followed at a later date by another advance made pursuant to a subsequent security agreement covering the same collateral, the lender has a perfected security interest in the collateral not only for the original debt but also for the later advance.”
Accordingly, even if the 1966 and 1967 notes did not contain future advance clauses, the financing statement filed on August 11, 1966 was in compliance with subdivision (1) of section 9-402 and when the bank’s interest attached in 1966, 1967 and 1968, the bank maintained the position of a perfected secured creditor.
The objectant has not indicated that at the time she ad *482 vanced money to the decedent that she relied upon the August, 1966 debt as having terminated. She was on notice with regard to the Work Wear contract by virtue of the financing statement. She has not indicated that prior to advancing money to the decedent a demand upon the bank was made as provided in section 9-208. She experienced no harm from the transactions between the bank and the decedent, because she did not rely upon the collateral between those parties when she advanced money to the decedent. It is therefore held that the payments to the bank pursuant to the Work Wear contract assignment were proper payments to a secured creditor and were not in violation of SCPA 1811 (subd 3).
As to the application of the proceeds of the Connecticut General Life policy, this court finds that the bank did properly reduce the obligations of the decedent with the proceeds. The bank’s testimony has indicated that the Sydell Gruder note and the Wolfson note each contained a clause which accelerated payment upon the death of any of the signators of the notes. Objectant did not object to such testimony. The 1968 note in evidence, which the bank contends exemplifies typical notes of their bank, contains a clause under which a subscribing party waives "presentment, demand for payment, notice of dishonor, and any and all other notices or demands in connection with delivery”. Decedent signed both the Sydell Gruder and Wolfson notes in either a comaker or indorser capacity. If the decedent were an indorser and secondarily liable, the conditions precedent to his liability would be presentment, dishonor and notice of dishonor (Uniform Commercial Code, §§ 3-413 and 3-414). Subdivision (6) of section 3-511 of the Uniform Commercial Code states that "[w]here a waiver of presentment or notice or protest is embodied in the instrument itself it is binding upon all parties”. Section 3-501 of the Uniform Commercial Code provides that presentment and notice of dishonor are not necessary to charge those secondarily liable where such acts are waived under section 3-511. Thus upon decedent’s death, the two notes became due, at the option of the bank, and all of the subscribers of the note were liable for the balance due. When Connecticut General Life paid over to the bank the proceeds of the policy the bank was at liberty to satisfy the decedent’s obligations as it saw fit.
Objectant’s contention that the Guardian Life policy proceeds should be delivered to the estate by the bank is without merit. The $10,000 obligation owed to the bank by decedent *483 was established by respondent’s testimony which was unchallenged (Hecla Powder Co. v Sigua Iron Co., 157 NY 437, supra). This objection is dismissed.
A conference is directed on Tuesday, March 1, 1977 at 1:30 p.m. prior to any further hearing on the remaining objections. No determination will be made regarding fees until all matters are resolved, at which time the court will be in a better position to appraise the relative value of the services rendered. It is urged that all interested persons be present at the conference. An order may be settled at this time if desired on five days’ notice with three additional days if service is made by mail.