No. 49,924

ALLIS-CHALMERS CREDIT CORPORATION, *Appellant,* v. CHENEY INVESTMENT, INC., *Appellee.*

(605 P.2d 525)

Opinion filed January 19, 1980.

*Larry B. Spikes,* of Martin, Pringle, Schell, and Fair, of Wichita, argued the cause and was on the brief for the appellant.

*Keith D. Richey,* of Rumsey and Richey, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a dispute between two secured creditors over the priority of their security interests in an Allis-Chalmers combine. The facts in the case are undisputed and are covered generally by a stipulation of fact filed by the parties in district court. The factual circumstances giving rise to the controversy are set out in chronological order as follows: On November 16, 1970, Lloyd Catlin executed a retail installment contract to Ochs, Inc., a dealer for Allis-Chalmers Corporation, to cover the purchase price of an Allis-Chalmers combine identified as G-7754. This contract was in a total amount of $10,149.44 including the financing charge. There was no provision in the contract for future advances. In the course of the opinion, this will be referred to as contract #1. This contract was assigned to plaintiff-appellant, Allis-Chalmers Credit Corporation, who financed the transaction. On November 27, 1970, a financing statement covering combine G-7754 was filed by Allis-Chalmers with the register of deeds of Barber County, Kansas.

On December 19, 1970, Cheney Investment Company, Inc., the defendant-appellee, made a cash advance to Lloyd Catlin, taking

a security interest (chattel mortgage) in combine G-7754. On December 24, 1970, Cheney Investment filed a financing statement covering combine G-7754 with the Barber County register of deeds. In the course of the opinion, we will refer to the security interest of Cheney Investment as the chattel mortgage. On September 17, 1971, Catlin purchased a new Allis-Chalmers combine G-17992 from Highway Garage and Implement Company, another dealer of Allis-Chalmers. The retail installment contract which created the security interest included both the new combine, G-17992, and the used combine, G-7754. This contract will be referred to in the opinion as contract #2. Contract #2 provided that contract #1 was cancelled and the notation "Payoff ACCC-Wichita $4,542.00" was written on its first page. The balance owing under contract #1 was included in the purchase price stated in contract #2. There was no other reference to the prior security agreement or financing statement. On September 29, 1971, Allis-Chalmers Credit Corporation, as assignee of contract #2 from Highway Garage and Implement Company, filed a financing statement covering both the new combine G-17992 and the used combine G-7754. On February 16, 1972, Allis-Chalmers notified Cheney Investment of its claim to a senior security interest on combine G-7754, as Cheney had taken possession of that combine when Catlin defaulted on his loan payments to Cheney Investment.

On May 30, 1972, Allis-Chalmers and Cheney Investment executed a letter agreement to allow combine G-7754 to be returned to Catlin, the debtor, with each party to notify the other if Catlin defaulted on either financing agreement. On September 11, 1973, after several revisions and amendments to contract #2, Catlin sold combine G-17992 and paid Allis-Chalmers $11,641.12, leaving an unpaid balance of $8,300. A new payment schedule was prepared for the balance owing plus a new finance charge. Thereafter, Catlin defaulted on his payments, both to Allis-Chalmers and to Cheney Investment. On March 1, 1974, Cheney Investment sold combine G-7754 at a chattel mortgage sale, having taken possession shortly after Catlin defaulted on the Allis-Chalmers obligation. Allis-Chalmers participated in the sale but was not the purchaser. The sale proceeds totaled $8,560. Subtracting the amount then owing to Cheney Investment and costs, there remained $2,111.80 to satisfy the security interest of Allis-Chalmers.

Following the above events, the plaintiff, Allis-Chalmers, brought this action against Cheney Investment for conversion of combine G-7754, claiming a senior and prior security interest. At that time, Catlin's indebtedness to Allis-Chalmers was in the amount of $8,650 plus interest. In its answer, Cheney Investment claimed a first and prior lien against the combine in the amount of $6,093.79 plus interest. All of the above facts were stipulated by the parties. In addition to the stipulation, the case was submitted on the deposition of Richard F. Ellis, vice-president of Allis-Chalmers. In his deposition, Ellis testified that contract #1 between Ochs, Inc., and Lloyd Catlin was paid off and cancelled at the time contract #2 was executed and the balance owing on contract #1 was carried forward and became a part of the consideration for contract #2. He agreed that contract #2 was a new and separate contract.

The district court held in favor of defendant Cheney Investment, reasoning that contract #2 cancelled the prior contract #1 and was thus an entirely new and separate agreement which created an entirely new and distinct security interest. In its memorandum decision, the trial court emphasized that contract #1 was one involving only the sale of combine G-7754 and, since it contained no provision covering future advances or sales, it was a distinct and separate transaction from contract #2. The trial court then concluded that the advances made under contract #2, dated September 17, 1971, did not relate back and were not covered by the financing statement filed by Allis-Chalmers on November 27, 1970. Thus, it concluded that the intervening security interest of Cheney Investment, created by its chattel mortgage on December 19, 1970, and perfected by the filing of its financing statement on December 24, 1970, was a security interest, senior and prior to the security interest of Allis-Chalmers created by contract #2 in September of 1971. The trial court entered judgment in favor of defendant Cheney Investment, and Allis-Chalmers has appealed to this court.

The question of priority presented in this case is one of first impression in this state under the Kansas Uniform Commercial Code, K.S.A. 84-1-101 *et seq.* The subject of secured transactions is covered in Article 9 of the code (84-9-101 through 84-9-508). The question of priorities between conflicting security interests is

controlled by K.S.A. 84-9-312(5)(*a*). However, that section inter-relates with and must be read with other sections of Article 9 in order to be properly understood. At the outset, we should consider some of these provisions of the code before turning to a resolution of the issue presented. K.S.A. 84-9-303 requires both "attachment" and "perfection" for a security interest to come into existence. Attachment occurs when a creditor extends value and enters into an agreement for the debtor to give a security interest to the creditor in some property of the debtor (84-9-204[1]). Perfection is accomplished (with exceptions not here pertinent) upon the filing of a financing statement (84-9-302). It is immaterial which of these steps occurs first. It is provided in 84-9-402 that a "financing statement may be filed before a security agreement is made or a security interest otherwise attaches." The UCC comment to 84-9-303 states:

"If the steps for perfection have been taken in advance (as when the secured party files a financing statement before giving value or before the debtor acquires rights in the collateral), then the interest is perfected automatically when it attaches."

In this case, both of the parties have perfected their respective security interests. Simply stated, the issue to be determined is which of their security interests is entitled to priority over the other. Section 84-9-312(5)(*a*) governs the priority as between conflicting security interests. Prior to 1975, K.S.A. 84-9-312 provided in part as follows:

"**Priorities among conflicting security interests in the same collateral.** (1) The rules of priority stated in the following sections shall govern where applicable:  .  .  .

"(5) In all cases not governed by other rules stated in this section  .  .  .  priority between conflicting security interests in the same collateral shall be determined as follows:

"(*a*) *In the order of filing if both are perfected by filing, regardless of which security interest attached first under section 84-9-204(1) and whether it attached before or after filing;*" (Emphasis supplied.)

At this point, we should examine K.S.A. 84-9-402. Subsection (1) sets out the simple formal requisites of a financing statement under this article:

(1) Signatures of the debtor and secured party;

(2) addresses of both parties; and

(3) a description of the collateral by type or item.

It is important to note that the security agreement itself is not filed of record. As pointed out in the official UCC comment to

84-9-402, this section adopts a system of "notice filing." The notice itself indicates merely that the secured party may have a security interest in the collateral described. The burden is placed upon other persons to make further inquiry from the parties concerned in order to obtain a disclosure of the complete state of affairs. The code philosophy is that a simple, filed notice that the secured party and debtor *may* be financing with respect to collateral described in the financing statement should be a "red flag" warning to third parties not to proceed with any financing on the same collateral of the debtor until investigation is made to see that the road ahead has been cleared. See *In re Rivet,* 299 F. Supp. 374, 379 (E.D. Mich. 1969), citing Professor Roy L. Steinheimer, Jr., of the University of Michigan Law School, in a commentary on 9-402 in 23 M.C.L.A. 467. In his article, Professor Steinheimer suggests that if there is a prior filing, the second lender should do one of the following things:

(1) Insist that the record be cleared by the filing of a termination statement under 9-404, or

(2) Enter into a subordination agreement with the first lender which appropriately apportions priorities in the collateral under 9-316.

The controversy arose in this case, as it has in other cases, because K.S.A. 84-9-312(5)(*a*), as originally adopted, did not have clear and specific language governing the right of a lender to include later advances made in subsequent transactions under the financing statement filed at the time of the original transaction. It should be noted that K.S.A. 84-9-204(5) provided that "[o]bligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment."

The issue as to the priority of the security interest of a lender, who made advances after the filing of the original financing statement, over the security interest of an intervening creditor came before a Rhode Island superior court in *Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.,* 3 U.C.C. Rptr. Serv. 1112 (R.I. Super. Ct. 1966). The district court in the present case relied upon *Coin-O-Matic* in holding that the security interest of Cheney Investment was prior to the security interest of Allis-Chalmers. In *Coin-O-Matic,* the debtor gave a security interest in an automobile to the seller, who assigned the debt to

Rhode Island Hospital Trust Company which filed a financing statement. One year later, the debtor gave Coin-O-Matic a security interest. It filed a financing statement. The following month, Rhode Island Hospital Trust Company loaned the debtor an additional sum of money, one-third of which was used to pay off the first note to Rhode Island Hospital Trust Company. The first note was cancelled, a new security agreement executed, and a new financing statement filed. When the debtor went into bankruptcy, both Coin-O-Matic Service Company and Rhode Island Hospital Trust Company claimed a prior security interest in the automobile. Rhode Island Hospital Trust Company argued that the first financing statement was sufficient to protect the second contract, as it effectively put the whole world on notice that the collateral was subject to present and future security interests in favor of the filing party. This argument was rejected by the Rhode Island superior court. The *Coin-O-Matic* court first recognized that giving the first-to-file priority in all subsequent transactions placed the lender in an unusually strong position. The court reasoned that, under such a holding, the debtor would be precluded from obtaining a second loan, even to pay off the first, because subsequent lenders would be reluctant to lend money based on the collateral already mortgaged, as their security interest would always be subject to preemption by a subsequent security agreement in favor of the first creditor. The court stated that to construe the UCC to give the first lender an interest in collateral for future advances, absent future advance provisions in the security agreement, would render information obtained under 9-204 irrelevant. The court noted that the first creditor could easily protect future advances by including a future advance provision as authorized by 9-204(5).

The ultimate conclusion in *Coin-O-Matic* was that a reasonable interpretation of 9-312(5)(*a*) should be that a "single financing statement in connection with a security agreement when no provision is made for future advances is not an umbrella for future advances based upon new security agreements, notwithstanding the fact that involved is the same collateral." (3 U.C.C. Rptr. Serv. at 11201.) This portion of the decision in *Coin-O-Matic* caused controversy and widespread criticism of the rule announced therein.

The holding in *Coin-O-Matic,* requiring a future advance

clause in the original security instrument in order for future advances to have 9-312 priority, has been rejected by the vast majority of the jurisdictions in subsequent cases. In rejecting *Coin-O-Matic,* those courts generally stress the "notice" or "red flag" function of the code and hold that a financing statement on file is notice to the entire world of present or *future* security interests in the collateral. Cases taking this approach which are contrary to the rule of *Coin-O-Matic* are the following: *In re Rivet,* 299 F. Supp. 374; *First Nat. Bank & T. Co. of Vinita, Okl. v. Atlas Credit Corp.,* 417 F.2d 1081 (10th Cir. 1969); *James Talcott, Inc. v. Franklin National Bank,* 292 Minn. 277, 194 N.W.2d 775 (1972); *In re Wilson,* 13 U.C.C. Rptr. Serv. 1195 (E.D. Tenn. 1973); *In re Gilchrist Company,* 403 F. Supp. 197 (E.D. Pa. 1975); *Index Store Fixture Co. v. Farmers' Trust Co.,* 536 S.W.2d 902 (Mo. App. 1976); *Thorp Finance v. Ken Hodgins,* 73 Mich. App. 428, 251 N.W.2d 614 (1977); *Matter of Gruder,* 89 Misc. 2d 477, 392 N.Y.S.2d 203 (1977); *Genn v. CIT Corp.,* 40 Md. App. 516, 392 A.2d 1135 (1978); *Chrysler Credit Corp. v. Community Banking Co.,* 35 Conn. Supp. 73, 395 A.2d 727 (1978).

The rationale found in *James Talcott, Inc. v. Franklin National Bank,* 292 Minn. at 290-292, well illustrates the approach taken by those courts which have rejected the rule adopted in *Coin-O-Matic:*

"Even where the parties originally contemplate a single debt, secured by a single item of property or a single group of items, the secured party and the debtor may enter into further transactions whereby the debtor obtains additional credit and the secured party is granted more security. The validity of such arrangements as against creditors, trustees in bankruptcy, and other secured parties has been widely recognized by many courts. See, DuBay v. Williams, 417 F.2d 1277 (9 Cir. 1969); Grain Merchants of Indiana, Inc. v. Union Bank & Sav. Co. 408 F.2d 209 (7 Cir.), certiorari denied sub nom. France v. Union Bank & Sav. Co. 396 U.S. 827, 90 S.Ct. 75, 24 L. ed 2d 78 (1969); Rosenberg v. Rudnick, 262 F. Supp. 635 (D. Mass. 1967).

"Using future-advance clauses and using after-acquired property clauses in the original security agreement are not the only means by which perfected security interests can be obtained in subsequently contracted obligations or in goods the debtor may later come to own. There is nothing exclusive about § 336.9—204(3, 5). Parties may use future-advance and after-acquired clauses, and they are a great convenience. But, if they are not used, there is nothing in the code which prevents the parties from accomplishing the same result by entering into one or more additional security agreements.

". . . The better view holds that, where originally a security agreement is executed, an indebtedness created, and a financing statement describing the

collateral filed, followed at a later date by another advance made pursuant to a subsequent security agreement covering the same collateral, the lender has a perfected security interest in the collateral not only for the original debt but also for the later advance."

*Matter of Gruder,* 89 Misc. 2d at 481, reached the same result, quoting White & Summers, U.C.C. HB, § 25-4 at p. 908, as follows:

"We reject the *Coin-O-Matic* holding for three reasons. First, it provides little protection against overreaching, for a creditor can avoid the holding simply by including a future advance clause in his security agreement. Second, we suspect that the *Coin-O-Matic* court misunderstands commercial practice. We suspect that it is a rare banker who will lend against the same collateral which secures a prior loan; in our experience the commercial practice is for the second lender to pay off the first and so take a first priority as to all of the collateral. Finally, *Coin-O-Matic* conflicts with the most obvious and we think intended meaning of 9-312(5)(a); if the draftsmen had wished to qualify the rule as the *Coin-O-Matic* court did, they could have done so."

The only case supporting *Coin-O-Matic* called to our attention is *Texas Kenworth v. First Nat. Bank of Bethany,* 564 P.2d 222 (Okla. 1977). We have concluded that the district court in this case was not justified in relying upon the decision in *Coin-O-Matic.* The rule of *Coin-O-Matic* was immediately rejected by the UCC permanent editorial board. It conceded that under the 1962 code, as originally adopted, the position of an intervening creditor in reference to a subsequent advance by an earlier secured party was debatable. In order to clarify the matter, the editorial board suggested an amendment to 9-312 by the addition of a new subsection (7) which was subsequently adopted in various states. Subsection (7) was adopted by the Kansas legislature by amendment of K.S.A. 84-9-312 in 1975, effective January 1, 1976. The new subsection (7) may be found at K.S.A. 1979 Supp. 84-9-312(7) and is as follows:

"(7) If future advances are made while a security interest is perfected by filing or the taking of possession, the security interest has the same priority for the purposes of subsection (5) with respect to the future advances as it does with respect to the first advance. If a commitment is made before or while the security interest is so perfected, the security interest has the same priority with respect to advances made pursuant thereto. In other cases a perfected security interest has priority from the date the advance is made."

The issue has clearly been laid to rest in Kansas by the adoption of the new subsection (7) of K.S.A. 1979 Supp. 84-9-312 by the Kansas legislature in 1975. We note the official UCC comment to

that section which is printed in the 1979 Supp. at p. 64, and which states as follows:

"7. The application of the priority rules to future advances is complicated. In general, since any secured party must operate in reference to the Code's system of notice, he takes subject to future advances under a priority security interest while it is perfected through filing or possession, whether the advances are committed or non-committed, and to any advances subsequently made 'pursuant to commitment' (Section 9-105) during that period."

Comment (7) is followed by example 5, which sets forth a hypothetical factual situation involving a question of priority which essentially presents the same issue to be decided in this case. It states:

"Example 5. On February 1 A makes an advance against machinery in the debtor's possession and files his financing statement. On March 1 B makes an advance against the same machinery and files his financing statement. On April 1 A makes a further advance, under the original security agreement, against the same machinery (which is covered by the original financing statement and thus perfected when made). A has priority over B both as to the February 1 and as to the April 1 advance and it makes no difference whether or not A knows of B's intervening advance when he makes his second advance.

"A wins, as to the April 1 advance, because he first filed even though B's interest attached, and indeed was perfected, before the April 1 advance. The same rule would apply if either A or B had perfected through possession. Section 9-204(3) and the Comment thereto should be consulted for the validation of future advances.

"The same result would be reached even though A's April 1 advance was not under the original security agreement, but was under a new security agreement under A's same financing statement or during the continuation of A's possession."

Also note should be taken of the official UCC comment to K.S.A. 1978 Supp. 84-9-402, which states on p. 75 of the 1979 Supp. as follows:

"However, even in the case of filings that do not necessarily involve a series of transactions the financing statement is effective to encompass transactions under a security agreement not in existence and not contemplated at the time the notice was filed, if the description of collateral in the financing statement is broad enough to encompass them. Similarly, the financing statement is valid to cover after-acquired property and future advances under security agreements whether or not mentioned in the financing statement."

It is clear that subsection (7) was adopted by the Kansas legislature to make it clear that K.S.A. 84-9-312(5)(a) should be applied to future advances made by the first creditor, whether such advances are "committed" or "noncommitted" thus making it immaterial whether or not there was a future advance provision in

the original security agreement. We regard this amendment as a clarification of the original intent of the legislature when it adopted the Uniform Commercial Code in 1965.

On the basis of the reasoning set forth above, we hold that the security interest of Allis-Chalmers in combine G-7754 is prior and superior to the security interest of the defendant, Cheney Investment, Inc. Under the undisputed facts, the proceeds from the sale of the Allis-Chalmers combine G-7754 totaled $8,650. At the time the suit was filed, Catlin's indebtedness to Allis-Chalmers was in the total amount of $8,650 plus interest. Since the security interest of Allis-Chalmers equals or exceeds the amount of the net proceeds received from the sale of the combine, after expenses of sale, Allis-Chalmers is entitled to apply the net proceeds to its debt.

The judgment of the district court is reversed and the case is remanded to the district court with directions to enter judgment in favor of the plaintiff Allis-Chalmers, awarding it the net proceeds from the sale of combine G-7754, after deducting the expenses of sale, together with interest as allowed by law and for the costs of the action.

HOLMES, J., dissenting. I must respectfully dissent. In my opinion the trial court reached the right conclusion in this case and I would adopt the rule and reasoning set forth by the Rhode Island Superior Court in *Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.,* 3 U.C.C. Rptr. Serv. 1112 (R. I. Super. Ct. 1966), cited and discussed in the majority opinion. The facts are adequately set forth by the majority and need not be repeated.

As noted by the majority, a basic theory behind the UCC is one of notice filing and that a notice when filed becomes a red flag to be heeded by all. However, the same applies to the filing made by defendant Cheney Investment, Inc. Their filing is also a red flag to all who might thereafter undertake dealings with the original debtor, Catlin. In the instant case it appears clear that the initial contract and obligation underlying the first filing by Allis-Chalmers was paid and satisfied at the time the second contract was entered into and a second financing statement filed. To say that, lacking a future advance clause as contemplated by the code, life could be breathed back into the first filing when the underly-

14

ing obligation upon which it was based has been satisfied is difficult to accept.

The majority chooses to follow the majority rule that no future advance clause was necessary in the initial security instrument but concedes that the meaning of the statute (84-9-312[5]), upon which this conclusion rests, was debatable. The UCC permanent editorial board recognized the deficiency and recommended the addition of 9-312(7) to the code. Kansas adopted this new provision, to cover situations like the one before this court, in 1975. However, this case must be determined under the "debatable" meaning of the code prior to that amendment.

Plaintiff could have protected its future advances and its second contract by the notice filed under the first contract, if it had desired to do so, by complying with former 84-9-204(5) and including an after-acquired property and future advance clause in the original security agreement. The official UCC comment to 84-9-204(5) states in part:

"8. Under subsection (5) collateral may secure future as well as present advances when the security agreement so provides. . . . In line with the policy of this Article toward after-acquired property interests this subsection validates the future advance interest, provided only that the obligation be covered by the security agreement." K.S.A. Vol. 7, page 352.

The majority concludes that 84-9-312(7) was passed by the legislature in 1975 "as a clarification of the original intent of the legislature" and that 84-9-312(5) really applied to future advances all along even though there was no compliance with 84-9-204(5). Such a conclusion may not be justified. The general rule is set forth in *Curless v. Board of County Commissioners,* 197 Kan. 580, 587, 419 P.2d 876 (1966), where this court stated:

"But when the legislature revises a prior existing law it will be presumed that the legislature intended to make some change in the law as it existed prior to the amendment. In the case of *State, ex rel., v. Richardson,* 174 Kan. 382, 256 P.2d 135, at page 386, this court said:

'We will presume that the legislature in revising the mentioned statute intended to make some change in the existing law and we will, therefore, give effect to the amendment. A change in phraseology or a deleting of a phrase of the original act raises a presumption that the change of meaning was also intended. . . .'

"Any other construction would mean the legislature accomplished nothing by its revision. We must assume that a revision of a prior law was intended to supply some want and to fill some deficiency in existing legislation. (*City of Emporia v. Norton,* 16 Kan. 236; *Brown v. Illinois Bankers Life Assur. Co.,* 144 Kan. 670, 63 P.2d 165; *State, ex rel., v. Richardson, supra.)*"

In *Coin-O-Matic,* the court, after quoting section 9-312(5)(a), states at 1115-1120:

"The defendant relies wholly upon what it considers the compelling literal meaning of the language of the section. That is to say, that having entered into a security transaction which covered the 1963 Chevrolet Greenbrier Station Wagon and having filed a financing statement it comes ahead of the plaintiff who had a security interest in the same collateral but whose filing of a financing statement was subsequent in time to the original filing and ahead of defendant's second filing. Obviously with respect to the original transaction there is no dispute that the prior filing of the financial statement would govern. But the defendant carries its argument a step further and contends that the original financing statement is an umbrella which gives the defendant a priority with respect to its second security transaction notwithstanding that the plaintiff's security interest was established in point of time prior to defendant's second security transaction.

"The defendant contends that as long as there is a financing statement on file the whole world is given notice that the debtor is obligated; that there is a security interest in the particular collateral and that the debtor may at any time after the original transaction become further indebted and enter into an additional security agreement with respect to the collateral.   .   .   .

.   .   .   .

"It will be observed as already noted that the original conditional sales agreement   .   .   .   has no provision for future advances.

"Section 6A-9-204, subsection (5) provides:

'Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment.'

Defendant contends that this provision merely permits a lender to include a provision for future advances in the original security agreement and that when this is so provided it obviates the necessity of executing subsequent security agreements with respect to the collateral in question but that it does not in any way affect the priority with respect to future advances as long as the financing statement covering the collateral in question is prior in time and additional security agreements are obtained with each new loan.   .   .   .   If this is so, it places a lender in an unusually strong position, vis-a-vis, the debtor and any subsequent lenders. In fact, it gives the lender a throttle hold on the debtor. For example, a debtor borrows $25,000.00 from a lender to be paid over a three-year period without any right of anticipation. The security is the equipment of the debtor. No provision is made for future advances. The financing statement is filed. The debtor reduces the obligation to $12,500.00 and now seeks to borrow an additional $5,000.00. The original lender is not interested in making a second loan. The debtor is in no position to pay off the loan without borrowing from another lender. The original lender does not desire to liquidate the obligation except in strict accordance with the agreement. Under the theory advanced by the defendant the original debtor cannot borrow from the second lender because no second lender can safely advance the money as long as there is a possibility that a future advance by the original lender would have priority in the collateral over the second lender.   .   .   .

. . . .

"Section 6A-9-312(5) deals with priority between conflicting security interests in the same collateral and gives a priority in the order of the filing but that obviously does not relate to separate and distinct security transactions. Moreover, a careful examination of 6A-9-312 and the other applicable provisions of the Code lead to the conclusion that the reasonable interpretation of 6A-9-312 is that a security agreement which does not provide for future advances is a single transaction and in the case of subsequent security agreements there is required a new financing statement. That is to say, a single financing statement in connection with a security agreement when no provision is made for future advances is not an umbrella for future advances based upon new security agreements, notwithstanding the fact that involved is the same collateral."

In the instant case the parties appear to have considered the original transaction as a single transaction. No provision was made in the security agreement for future advances or after-acquired collateral. At the time of the second transaction a new combine was purchased, a new contract prepared, the old contract was paid off and cancelled. The case falls squarely within the rationale and holding of *Coin-O-Matic* and the opinion in that case is, in my opinion, a correct application of the UCC provisions as they existed prior to the 1975 amendment to the statute.

I would affirm the trial court with the proviso that any funds collected by Cheney Investment, Inc., in excess of the indebtedness due it together with appropriate costs, storage and other items properly included, be paid to plaintiff to apply on its claim against Catlin and the security.

SCHROEDER, C.J. and HERD, J., join the foregoing dissenting opinion.