(74 P.3d 57)
No. 89,523

MILLENNIUM FINANCIAL SERVICES, L.L.C., *Appellee*, v. NORMAN THOLE; TNT AUTO GROUP OF AUGUSTA, INC.; TNT AUTO GROUP OF ANDOVER, INC.; TNT AUTO GROUP OF DERBY, INC.; TNT AUTO GROUP, L.L.C.; TNT COMPLETE CAR CARE CENTER, INC.; and TNT MANAGEMENT GROUP, INC., Defendants; and JOHN B. DOPPS, *Appellant*.

Opinion filed August 8, 2003.

*J. Michael Lehman, Petra Johnson,* and *Eric Bruce,* of Wichita, for the appellant.

*Lynn D. Preheim, Mary M. McPheeters,* and *David Morgan,* of Stinson, Morrison, Hecker, L.L.P., of Wichita, for the appellee.

Before MARQUARDT, P.J., PIERRON and JOHNSON, JJ.

PIERRON, J.: John B. Dopps appeals the district court's findings that Millennium Financial Services (MFS) had a perfected security interest that superceded Dopps' interest in the collateral; that MFS sufficiently established the value of the collateral; that MFS was entitled to summary judgment on its claim of conversion; and that MFS was entitled to an award of attorney fees.

Dopps is a self-employed chiropractor in Wichita. He is also engaged in the business of loaning money to car dealers for the purchase of inventory under the name Premier Auto Sales.

Norman Thole is the owner of TNT Auto Group of Augusta, Inc.; TNT Auto Group of Andover, Inc.; TNT Auto Group of Derby, Inc.; TNT Complete Car Care Center, Inc.; and TNT Management Group, Inc. (TNT) which are Kansas corporations. TNT Auto Group, L.L.C., (Auto Group) is a Kansas limited liability company.

MFS is a Kansas limited liability company whose members are Trey Cusick and General Financial Services (GFS). GFS is a Kansas company owned all or in part by Steve Miller. Steve Miller is a manager of MFS.

In December of 1997, Dopps began financing the purchase of cars for Thole and Auto Group. The initial agreement was that Thole would purchase vehicles from auctions with Dopps' money. Dopps would then hold the title to the vehicle and, upon sale, Thole would purchase the title from Dopps. Over time, Thole's business expanded and around July 1998, he began doing business in two locations.

On July 1, 1998, Thole, doing business as Auto Group, and Dopps signed a security agreement. The agreement covered "all vehicles consigned or floor planned by John Dopps now and hereafter acquired."

On November 1, 1999, Thole executed a floor plan agreement with MFS according to which Thole would borrow money from MFS for the purpose of purchasing used vehicles for resale. To secure payment on the floor plan agreement, Thole, individually and as a representative of TNT, executed a security agreement with MFS with an effective date of November 1, 1999. The agreement granted MFS a security interest in the following described property:

"All personal property and fixtures in which Debtor has an interest, now or hereafter existing or acquired, and wherever located, including but not limited to all present and hereafter existing or acquired accounts receivable, contract rights, general intangibles, equipment, furnishings, vehicles, goods, inventory (including but not limited to vehicles) and all proceeds of and to any of the foregoing."

In a series of transactions in November 1999, MFS loaned Thole and TNT $437,730 for the purchase of vehicles as inventory.

On December 16, 1999, MFS filed four financing statements with the Kansas Secretary of State. The debtors listed on the financing statements were: Norman Thole and TNT Auto Group of Andover, Inc.; TNT Auto Group of Augusta, Inc.; TNT Auto Group, L.L.C.; TNT Management Group, Inc.; TNT Auto Group of Derby, Inc.; and TNT Complete Car Center, Inc., respectively. Thole signed each Uniform Commercial Code-Financing Statement-Form UCC-1 (UCC-1). His signature was intended to bind each corporation and himself individually. Additionally, on any UCC-1 which contained more than one debtor, Thole intended

that his single signature would bind both debtors listed on the form.

When Thole and TNT failed to make payments due under the terms of the floor plan and security agreements, MFS filed a lawsuit on May 16, 2000, to foreclose on its security interest in the collateral. Dopps was joined as a defendant because MFS was aware that he might claim a lien or interest in the collateral. The petition requested judgment against defendants for the unpaid principal balance of $159,780, with accrued interest, court costs, and all fees and expenses of collection, including reasonable attorney fees. Alternatively, the petition requested the return of the collateral, foreclosure of MFS's security interest, and the court's determination its security interest was first and prior.

On May 16, 2000, MFS also filed a motion for immediate possession of the vehicles. The district court denied the motion on the basis it had questions regarding the proper perfection of MFS's security interest since Thole's signature appeared only once on the bottom of each financing statement, but two different debtors were named on three of the four filed UCC-1s.

On or about May 22, 2000, Dopps took possession of approximately 50 vehicles that were the collateral at issue in the lawsuit. At the time of trial, Dopps had sold approximately 40 of the aforementioned vehicles. The status of the proceeds from the sold vehicles is currently unknown, although Dopps testified the proceeds went to pay off a bank loan.

The only security agreement entered into between Dopps and Thole prior to the filing of the lawsuit provided a security interest in cars purchased by Thole dba Auto Group, and made no mention of TNT. Dopps did not obtain a security agreement from TNT until November 2000. Additionally, Dopps admitted he did not file a UCC-1 with the Kansas Secretary of State based on his security agreement with Thole, nor did he ever file any UCC-1s with regard to TNT. Dopps did not believe it was necessary for him to file a UCC-1 to perfect his interest in the vehicles. He claimed his attorney advised him he would be protected if he filed a notice of security interest (NOSI) on the vehicles he financed.

In order to resolve the lawsuit, Thole and TNT made an offer of judgment to MFS, which was accepted and filed with the court on November 2, 2000. Under the terms of this judgment, there is presently owed and unpaid from Thole and TNT the following amounts: as of May 12, 2000, unpaid principal balance of $159,780, together with accrued interest of $5,633.88, with interest accruing thereafter at a rate of 9% per annum or $39.39 per diem, until paid; court costs; and all fees and expenses of collection, including reasonable attorney fees.

In January 2001, MFS amended its petition to include a claim for conversion against Dopps. The amended petition alleged the estimated total value of the collateral was $301,410, and requested the court award it judgment against Dopps in the amount of $159,780, together with interest, costs, expenses, and attorney fees.

In February 2001, MFS filed a motion for summary judgment against Dopps. The motion sought judgment declaring MFS's security interest superior to Dopps' claim; finding Dopps liable for conversion up to the amount of MFS's judgment against Thole and TNT; and allowing MFS to repossess any and all remaining vehicles, including those improperly repossessed by Dopps.

In its order granting summary judgment to MFS, the district court held that the UCC-1s filed by MFS perfected its security interest in the collateral at issue because the UCC-1s provided notice to third parties. Further, the court found Dopps did not have a security interest in the collateral until November 2000, because the filing of a NOSI with the Kansas Department of Revenue was not the proper way to perfect a security interest in vehicle inventory under Kansas law. Thus, MFS's interest in the vehicles superceded the interest claimed by Dopps. Additionally, the court held that because K.S.A. 84-9-312 was a pure race statute, it was irrelevant whether MFS had knowledge of Dopps' claimed interest in the collateral when MFS filed its UCC-1s.

The district court granted MFS's motion for summary judgment on its claim of conversion and held it was entitled to judgment in the amount of the value of the inventory up to $159,780 plus interest, costs, expenses, and reasonable attorney fees necessary to obtain judgment against Thole and TNT to be determined at a

later date. The only issue reserved for trial was whether an agreement existed between Dopps and MFS that would allow Dopps to offset MFS's judgment, which was the subject of Dopps' counter-claim. This issue is not germane to this appeal.

Dopps had previously filed a cross-claim against Thole and TNT and a counter-claim against MFS. He was awarded judment on the cross-claim in the amount of $200,000. The counter-claim against MFS proceeded to trial where judgment was granted in favor of MFS and against Dopps. Neither the cross-claim nor the counter-claim are germane to this appeal.

Dopps disputed the proposed journal entry of judgment prepared by MFS on the basis that MFS did not properly set forth the value of the collateral at issue. To resolve the issue, MFS set forth trial testimony by Dopps that the value of the vehicles he had taken was in excess of $410,587.82. This amount was reached by adding the total amount of the vehicles included on Exhibit H at trial, to which Dopps testified included a list of all the vehicles taken by him. Ultimately, the court agreed and entered judgment against Dopps in the amount of $159,780 plus interest, costs, expenses, and reasonable attorney fees.

Based upon the district court's prior rulings, MFS moved for an award of attorney fees in the amount of $102,494.07. Dopps' counsel stipulated the amount of fees was reasonable but objected to the existence of an award. Based upon the stipulation and a finding by the district court that all of the attorney fees incurred by MFS were part of the collection process for the original loan, MFS was awarded its requested attorney fees.

In granting partial summary judgment to MFS, the district court determined that it had a perfected security interest in the collateral which superceded Dopps' interest in the collateral. On appeal, Dopps makes two arguments in support of his contention that the court's judgment on this issue should be reversed: (1) MFS's UCC-1s are invalid because they include two debtors and only one signature, which did not specifically reflect the representation capacity of the person signing the UCC-1; and (2) the UCC-1s were taken in bad faith.

This court's standard of review for summary judgment is well established. See *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000). Resolution of this issue involves interpretation of the Uniform Commercial Code. Interpretation of a statute is a question of law and is reviewed de novo. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000).

Three of the four filed financing statements in this case contained the names of two debtors. Each of the financing statements, however, contained only one signature, that of Thole individually. No corporate capacity was indicated. Dopps contends the fact Thole did not sign for each individual debtor rendered the UCC-1s invalid and was detrimental to the issue of putting third parties on notice.

The formal requisites of a financing statement are controlled by K.S.A. 84-9-402. Of particular importance is the fact the financing statement must give the names of the debtor and the secured party, and must be signed by the debtor. K.S.A. 84-9-402(1). Additionally, K.S.A. 84-9-403(4) indicates the financing statements are indexed according to the names of the debtors, not the names of the corporate officers or signatures of the debtors. There is no dispute that more than one debtor may be listed on a single financing statement. See K.S.A. 84-9-403(4) ("names of debtors" clearly establishes multiple debtors may be listed on a single UCC-1).

The purpose of filing a financing statement is to provide a subsequent creditor with notice of a prior security interest. *Turnbull Oil, Inc. v. N-B Company, Inc.*, 24 Kan. App. 2d 266, 269, 943 P.2d 511 (1997). Here, the actual names of the debtors were properly listed and the financing statement was technically signed by Thole, who was the corporate representative of the debtors. Despite the fact the UCC-1s listed multiple debtors and were only signed once, the filed UCC-1s served their purpose to provide notice that the debtor(s) may be financing with respect to the collateral. Dopps was put on notice and had the burden to make further inquiry from the parties concerned before providing financing on the same collateral. See *Turnbull*, 24 Kan. App. 2d at 269.

The core issue here is whether one signature was sufficient to comply with K.S.A. 84-9-402(1) when there were two debtors listed on the UCC-1. There is no dispute that Thole intended his signature to bind both debtors. Further, Thole was in fact the corporate representative for all the debtors listed on all the UCC-1s at issue. This is simply not a case where the UCC-1s were completely unsigned by the debtor.

Even if we were to determine that the failure of Thole to sign the financing statement in his corporate capacity for both debtors listed on the statement was error, Dopps is still not due relief. K.S.A. 84-9-402(8) provides that "[a] financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." The question of whether an error is minor, so as not to be seriously misleading, is to be determined on a case-by-case basis. *Turnbull*, 24 Kan. App. 2d at 271.

Typically, the minor error rule has been applied to determine whether a debtor's name, a secured party's name, or the description of the collateral was properly listed. Kansas courts have not addressed the issue of whether a debtor's signature may be substantially misleading. In *Pearson v. Salina Coffee House, Inc.*, 831 F.2d 1531, 1536 (10th Cir. 1987), the court held minor errors are those which will result in the discovery of a financing statement while searching under the debtor's correct legal name. In contrast, a substantial error is one which would result in the misfiling of the security agreement or financing statement. See K.S.A. 84-9-402, Kansas Comment, 1996 subsection (8) (noting that depicting debtor "ABC, Corp." rather than "ABC Co., Inc." is a minor error, but designating it as "BCA, Corp." is a substantial error since indexing would be totally thrown off).

The UCC provides a system for filing notice whereby others are put on notice of a security interest. *Allis-Chalmbers Cred. Corp. v. Cheney Investment, Inc.*, 227 Kan. 4, 7-8, 605 P.2d 525 (1980). If Dopps had searched the record, he could not reasonably have been misled, and Dopps does not claim he searched the record and was misled. Any search under the debtors' legal names would have shown MFS had a security interest in the vehicle inventory.

Any error in the debtor's signature was minor. The financing statements substantially complied with K.S.A. 84-9-402 and properly provided notice to any third party. The district court did not err in finding MFS had a properly perfected security interest in the collateral.

Dopps further makes an abbreviated argument that MFS's security agreement was not perfected because it was taken in bad faith, an issue not considered by the district court in its decision. The proper inquiry is whether MFS's properly perfected security interest is valid despite Dopps' claim that MFS knew he was an unperfected creditor on the same collateral. MFS denies it had prior knowledge of Dopps' unperfected status at the time it filed its UCC-1s.

K.S.A. 84-9-312 provides the statutory rules to determine the priority of competing security interests in collateral. K.S.A. 84-9-312 does not require good faith by a secured creditor and is a "pure race" statute. *J.I. Case Credit Corp. v. Foos,* 11 Kan. App. 2d 185, 189, 717 P.2d 1064, *rev. denied* 239 Kan. 694 (1986). As such, the *Foos* court stated:

"This means the secured creditor who wins the 'race' to the appropriate filing office has priority without regard to the prevailing creditor's state of mind and knowledge. The Bank, having perfected its security interest in the equipment, is entitled to priority irrespective of its knowledge of Case's unperfected security interest in the same equipment. Any other conclusion would cause confusion and uncertainty in commercial transactions, undoing the clarity and preciseness intended under article 9 of the Code." 11 Kan. App. 2d at 189.

The holding in *Foos* is supported by the Kansas Comments to K.S.A. 84-9-312. The comments reiterate the fact that the first-to-file-or-perfect rule is based on the "pure race" concept. Knowledge is irrelevant.

"For example, if X makes a $5000 secured loan to the debtor but fails to file a financing statement, then Y makes a $7000 loan against the same collateral knowing full well that X has an unperfected security interest, then X files, Y would have priority under this subsection." K.S.A. 84-9-312, Kansas Comments, 1996 subsection (5).

Even assuming MFS had prior knowledge, under the preceding example, Dopps' argument is without merit. MFS was first to file.

The district court found in favor of MFS on its conversion claim and awarded damages against Dopps in the amount of $159,780. Dopps contends the district court erred in its calculation of damages because there was no evidence in the record as to the value of the vehicles. The function of an appellate court is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 747, 27 P.3d 1 (2001).

At trial, Dopps' testimony established that the value of the vehicles taken exceeded $410,587.82. This amount was reached by adding the total value of the vehicles included on Exhibit H, which Dopps testified included a list of all of the vehicles he repossessed. The amount was also based upon the value of the vehicles at the time they were purchased by Dopps from auction, *i.e.* the floor plan amount, even though the vehicles could have been sold at a higher price on the retail market. Dopps testified the dealerships identified on Exhibit H had agreed to take the vehicles listed and would pay Dopps the value of the vehicles indicated, if not more, but that payment was not due until after the car was sold. As such, the $410,587.82 was a definite amount to be paid to Dopps. Furthermore, Dopps testified if one were to add up the amount sold column on Exhibit H, the figure would be the amount he had received to date.

Attached to MFS's second amended petition was an exhibit that contained an itemized amount due from TNT to MFS. The total was $159,780, and this amount has never been seriously challenged. Thus, MFS carried its burden of establishing that the value of the vehicles converted by Dopps far exceeded MFS' damages and judgment. The district court did not err in establishing actual damages in the amount of $159,780.

Dopps further contends the district court erred in granting summary judgment in favor of MFS on its claim of conversion. Dopps seemingly argues he did not convert the subject collateral because he believed he had a valid security interest in the vehicles and at

the time he took possession of the vehicles, the court had found the validity of the MFS financing statement was questionable. Having found MFS had a valid perfected security interest in the collateral, the question of conversion has been effectively resolved.

Conversion is "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights. [Citation omitted.]" *Gillespie v. Seymour,* 14 Kan. App. 2d 563, 572, 796 P.2d 1060 (1990). Under Kansas law, "[c]onversion is a strict liability tort. [Citation omitted.] The required intent is shown by the use or disposition of property belonging to another, and knowledge or ignorance as to ownership of the property is irrelevant. [Citations omitted.]" *Commerce Bank, N.A. v. Chrysler Realty Corp.,* 76 F. Supp. 2d 1113, 1118 (D. Kan. 1999), *rev'd on other grounds,* 244 F.3d 777 (10th Cir. 2001).

Having found MFS had a prior perfected interest in the inventory, the district court did not err in granting summary judgment in favor of MFS and against Dopps on the issue of conversion. It is undisputed Dopps exercised the right of ownership over goods belonging to MFS to the exclusion of MFS's rights. Dopps further disposed of a majority of the collateral by allowing other car dealerships to sell the inventory. Dopps' state of mind is irrelevant to the issue of conversion.

For his final issue, Dopps contends that attorney fees are not a remedy to which MFS is entitled and the district court erred in awarding them to MFS. MFS argues it is entitled to attorney fees under K.S.A. 58-2312 and K.S.A. 84-9-504, and based on Dopps' conversion of the collateral at issue.

The issue of whether the district court had the authority to impose attorney fees under a particular statute is a question of law over which appellate review is plenary. *Hamilton v. State Farm Fire & Cas. Co.,* 263 Kan. 875, 879, 953 P.2d 1027 (1998). Attorney fees cannot be granted absent statutory authority or an agreement by the parties. A court does not have authority to impose attorney fees under its equitable powers absent statutory authority. *United States Fidelity & Guaranty Co. v. Maish,* 21 Kan. App. 2d 885, 905-06, 908 P.2d 1329 (1995).

K.S.A. 58-2312 provides that any note, mortgage, or other credit agreement may provide for the payment of reasonable costs of collection, including attorney fees. Dopps, however, never entered into a note, mortgage, or other credit agreement with MFS. Absent such agreement, K.S.A. 58-2312 is inapplicable. MFS had an agreement with Thole, and TNT and was awarded judgment including reasonable attorney fees against them. Dopps was not a party to that agreement.

K.S.A. 84-9-504(1)(a) provides that a secured party, after default, may sell, lease, or otherwise dispose of the collateral and is entitled to its reasonable expenses incurred in retaking the collateral, including reasonable attorney fees and legal expenses. MFS argues that if Dopps had not converted the collateral, MFS would have sold or otherwise disposed of it. Accordingly, under K.S.A. 84-9-504(1)(a), first priority of the proceeds would have gone to MFS for its expenses incurred in repossessing the collateral, preparing it for sale, and any other expenses, including reasonable attorney fees, necessary to dispose of the collateral. As such, MFS claims it should be awarded its attorney fees incurred in its attempt to foreclose its security interest by repossessing the collateral and collecting judgment against Thole, TNT, and Dopps.

Preliminarily, MFS was awarded its attorney fees against Thole and TNT. The only issue is whether MFS should be awarded fees against Dopps. Once again, there was no debtor-creditor relationship between Dopps and MFS. Likewise, there was no agreement between Dopps and MFS. K.S.A. 84-9-504 clearly contemplates a debtor-creditor relationship. It is a procedural statute pertaining to how a secured party disposes of collateral after a debtor has defaulted on that collateral. K.S.A. 84-9-504 does not explicitly authorize the payment of attorney fees from Dopps to MFS.

No Kansas cases provide for an award of attorney fees as an element of damage in a claim for conversion. Under Kansas law, the general rule is that the measure of damages based upon a claim for conversion is the fair and reasonable market value of the property converted at the time of the conversion. *Mohr v. State Bank of Stanley*, 241 Kan. 42, 55, 734 P.2d 1071 (1987). MFS argues, through the illustration of a case from the Fifth Circuit, it should

be afforded the opportunity to recover as actual damages either the outstanding principle balance plus interest, costs, and attorney fees, or the value of the collateral, whichever is less.

In *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635 (5th Cir. 1991), the court stated:

"Under Texas law, a secured party may recover as actual conversion damages the value of the secured interest in the collateral up to the value of the collateral. [Citation omitted.] DIB's security agreement secures the accrued interest, costs, and attorneys' fees as well as the outstanding principal. In this case, therefore, DIB may recover as actual damages either the outstanding principal balance plus the outstanding interest obligation, costs, and attorneys' fees or it may recover the value of the collateral, whichever is less." 934 F.2d at 652.

*Permian*, however, was based on Texas law and did not attempt to decide Kansas law. Although the holding in *Permian* seems logical, there appear to be no Kansas cases in support. Neither does it appear there are any Kansas cases that reject the reasoning set forth in *Permian*.

On its claim for conversion, MFS requested damages in the amount of $159,780, together with accrued interest of $5,633.88, with interest accruing thereafter at the rate of 9% per annum, court costs, and all fees and expenses of collection, including reasonable attorney fees. In essence, MFS pled the damages it was entitled to under K.S.A. 84-9-504(1)(a) and (b) had Dopps not converted the collateral. Accordingly, although the amount at issue is characterized as attorney fees, under the facts, it was actual damages incurred by MFS.

Had Dopps not converted the collateral, MFS would have disposed of the collateral through a sale pursuant to K.S.A. 84-9-504. The proceeds then would have been applied to the reasonable expenses of the sale, reasonable attorney fees and legal expenses incurred by the secured party, and the satisfaction of the indebtedness secured by the security interest. K.S.A. 84-9-504(1)(a) and (b). Then, any excess would have gone to satisfy the indebtedness secured by any subordinate security interest. K.S.A. 84-9-504(1)(c).

As previously stated, the measure of damages based upon a claim for conversion is the fair and reasonable market value of the property converted at the time of conversion. *Mohr*, 241 Kan. at 55.

Thus, MFS could have requested damages in the full amount of the collateral, presumably in excess of $400,000. Had it done so, it would have recovered exactly the amount that was pled in its conversion claim under K.S.A. 84-9-504(1)(a) and (b). Similarly, Dopps would have then recovered the remaining money up to the amount of his subordinate security interest under K.S.A. 84-9-504(1)(c).

Dopps should not be allowed to profit from his conversion of the collateral, and MFS should not be penalized for not repossessing the vehicles until a proper determination of priority was made by the district court. Allowing MFS its attorney fees as damages for conversion puts the parties in the same position they would have been had Dopps not converted the collateral. MFS would have repossessed the vehicles and been allowed its expenses and attorney fees pursuant to K.S.A. 84-9-504(1)(a).

The district court ruled on the conversion claim at the same time it determined the priorities. Thus, MFS should be granted attorney fees only up to the time the district court ruled on its motion for summary judgment. The remaining claim that went to trial was not related to priority or conversion, and the fees incurred by MFS in defending itself should not be included as damages against Dopps.

We affirm the district court's decision but remand for a determination of the attorney fees consistent with this decision.