ITT INDUSTRIAL CREDIT
COMPANY, Appellant,

v.

UNION BANK AND TRUST
COMPANY, Appellee.

Court of Appeals of Kentucky.

April 17, 1981.

William R. Mapother, C. Joseph Greene, Louisville, for appellant.

Sidney H. Hulette, Morganfield, for appellee.

Before COOPER, HOWERTON and McDONALD, JJ.

HOWERTON, Judge.

ITT Industrial Credit Company appeals from a summary judgment determining that the Union Bank and Trust Company has a superior lien against a 1973 Speicher trencher with a laser control system and a tracking receiver. ITT presents four arguments for reversal.

1. Priorities under Article 9 are based on a notice filing system and a first secured party to file has priority.

2. The principle that the first to file should have priority is recognized as the better law in a fact situation such as the one at bar.

3. To hold that the appellee has priority over the appellant would be inequitable under the facts of this case.

4. A holding for the appellant herein would serve to strengthen the Code's notice filing system—a highly desirable result.

On September 19, 1973, Hogan executed a security agreement and a financing statement listing the trencher as collateral. The documents were assigned to ITT and were filed in the Union County Court Clerk's office on September 27, 1973. Neither document contained a statement indicating that the trencher might be used as security for future advances by the creditor. The terms of the security agreement called for payment in full in 48 months or by September 1977. A financing statement is valid for five (5) years. KRS 355.9–403.

In December of 1975, Hogan purchased a 1976 trencher with funds obtained from the bank. He gave the bank a lien on the 1976 trencher and listed the 1973 trencher as additional collateral. The security agreement was recorded in the Clerk's office on December 31, 1975.

The 1973 loan was repaid on schedule. ITT contends that final payment was made on September 23, 1977, and that on September 22, Hogan began negotiations for a new loan with ITT. The Bank contends that the loan was paid in full on September 20, 1977. This is the only factual dispute, but it is not material. No termination statement was filed for the 1973 security agreement pursuant to KRS 355.9–404, and on October 13, Hogan purchased two trucks and two trailers which were financed by a new loan from ITT. ITT took a security interest in the new equipment and it also took a lien on the '73 trencher. The '73 trencher was listed on the new separate agreement as "additional collateral." The new agreement was filed October 19, 1977.

The basic question we must answer is what priority must be given to a perfected security interest in a single large item of equipment, as evidenced by a recorded security agreement and a financing statement which make no provisions for future advances, in relation to a subsequent creditor with a perfected interest in the same item, after the obligation of the first security agreement has been paid in full and the original creditor makes a new loan for new and different equipment taking a new security agreement and naming the original item as additional collateral. The exact question has not been decided in Kentucky. Other jurisdictions have decided the question both ways, some favoring the original creditor and others favoring the subsequent creditor. *See, e. g., Allis Chalmers Credit Corp. v. Cheney Investment, Inc.,* 227 Kan. 4, 605 P.2d 525 (1980); *In Re Gilchrist Co.,* 403 F.Supp. 197 (E.D.Pa.1975), and *Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.,* 3 U.C.C.Rep.Serv. 1112 (R.I.Super.Ct.1966).

The primary statutes involved in this controversy are KRS 355.9–312(5) and KRS 355.9–204(5). KRS 355.9–312(5) reads in part, "[i]n all cases not governed by other rules stated in this section . . ., priority between conflicting security interest in the same collateral shall be determined as follows: (a) in the order of filing if both are perfected by filing . . . ." KRS 355.9–204(5) reads, "[o]bligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment." Neither of the statutes provides a specific resolution to the issue before us.

The *Coin-O-Matic Service Co.* case, *supra,* supports the Bank in that it held that a secured loan did not take its priority from the time the original financing statement was filed where the original security agreement did not provide for future advances. ITT criticizes that case, and it also cites Professors White and Summers, U.C.C. H.B., § 25–4, which reads at page 908, as follows:

> We reject the Coin-O-Matic holding for three reasons. First, it provides little protection against overreaching for a creditor can avoid the holding simply by including a future advance clause in his security agreement. Second, we suspect that the Coin-O-Matic court misunderstands commercial practice. We suspect that it is a rare banker who will lend against the same collateral which secures a prior loan; in our experience the commercial practice is for the second lender to pay off the first and so take a first priority as to all of the collateral. Finally, Coin-O-Matic conflicts with the most obvious and we think intended meaning of § 9–312(5)(a); if the draftsmen had wished to qualify the rule as the Coin-O-Matic court did they could have done so.

Such criticism fails to convince us.

What constitutes "commercial practice" can be a very elusive thing. Indeed, many subsequent creditors can and do consolidate prior loans with the new loan and take a first lien against all of the proposed collateral. There are also many times, however, when the subsequent creditor desires to do business with the debtor and to make what appears to be a good loan. In such instances, the subsequent creditor may not want the first creditor to know that the debtor is now bringing his business elsewhere. In such cases, the subsequent creditor should

**4**

be able to rely upon the records and the law.

As we can see from this case, the law is indefinite as to future advances. The Official Code Comment appears to support the view that the agreement must specifically provide for future advances. It reads, "[u]nder subsection (5) collateral may secure future as well as present advances when the security agreement so provides." 4 R. Anderson, *Uniform Commercial Code*, § 9–204:1(8), (2d ed. 1971). Anderson further comments in § 9–204:16:

> If the secured transaction is intended to protect future advances, whether obligatory or optional, the security agreement should specify that the security interest in the collateral secures the original transaction as well as any additional advances that may thereafter be made. A security interest does not extend to future advances where the security agreement does not so provide. Great uncertainty would be introduced into the law if a security agreement securing a specific loan could be interpreted as an open-end agreement covering future advances.

Section 9–204:16 also provides that "[w]hether a particular future advance is protected by a security interest depends upon whether it was within the contemplation of the parties that the advance be made and be secured by the security interest."

It is certainly not apparent that ITT and Hogan contemplated the future advance at the time the original loan was made. The security in this case involves a single expensive sophisticated piece of equipment. We might have an entirely different situation, if the security agreement and financing statement were to secure collateral such as accounts receivable. What ITT is attempting to do is to resurrect a paid-off loan and security agreement with a financing statement which had not expired at the time of its new loan. KRS 355.9–403. The parties did renew the financing statement in 1978 when it expired.

Professors White and Summers may be correct when they state that the statute provides little protection against overreaching by a creditor who simply includes a future advance clause in his security agreements. We fail to see the relevance in this statement, however, because the view of allowing or requiring continued priority in financing statements, even where no provision is made for future advances, presents as much of a problem as might be created by overreaching creditors who put the statement in every security agreement. Some debtors may not agree, unless it is the only way to get a loan. Indeed, if a creditor is overreaching when it includes a future advance clause in its security agreement, why in the name of equity should the creditor be automatically afforded an ongoing priority when the statute is silent on that issue?

ITT relies heavily on *Allis Chalmers, supra*. That case held that where future advances are made while a security interest is perfected, the security interest has the same priority with respect to the future advances as it does with respect to the first advance. A basis for the holding was that a subsequent creditor finding a filed security agreement is put on notice to make further inquiry from the parties concerned in order to obtain a disclosure of the complete state of affairs.

We have already pointed out why we believe a subsequent creditor should not be required to contact the original creditor when there is no written provision or indication that the security agreement covers future advances. There are further distinctions between *Allis Chalmers* and this case, however. The Bank knew that ITT had priority in the 1973 trencher for as long as the interest contemplated existed. If the debt was paid as required, it would be satisfied in 1977. The Bank therefore reasoned that after that time, it would have a good and valid first lien on both the 1973 and 1976 trenchers.

■ The trial court specifically found that the original indebtedness to ITT was paid in full according to the terms of the original note and security agreement. It also found that the new note executed in

October of 1977 was a novation and that there was an intention to extinguish the old debt. A new note does extinguish an old debt when there is a novation. *Porter v. Bedell*, 273 Ky. 296, 116 S.W.2d 641 (1938), and *Cantrill Construction Co. v. Carter*, 418 F.2d 705 (6th Cir. 1969). Here, we are not confronted with a renewal, a rewrite, or an extension of the loan, but an actual new loan. The 1973 trencher was listed on a new security agreement as additional collateral for the new loan.

A security interest in something only exists when the debtor owes an obligation. In this case, the indebtedness was paid in full and there was a period of time when no security interest existed. Such was not the case in *Allis Chalmers*, where the facts are distinguishable.

■ We conclude that it is better practice, and more equitable in this situation, to require the original creditor to provide in his agreement for future advances, if there is an agreement between the debtor and the creditor for such advances. In our opinion, the statute requries this statement, and such a statement provides actual notice of the intention to a would-be subsequent creditor. Furthermore, equitably speaking, it would have behooved ITT to have done a little checking before making its new loan. Any lender who makes a future advance without also investigating the state of the collateral at the time of the advance is asking for trouble. In *Spector United Employees Credit Union v. Smith*, 263 S.E.2d 319 (N.C.App.1980), we read:

> A prudent lender would be well advised to make sure that the debtor has not transferred or otherwise disposed of the collateral securing the original loan before attempting to expand the obligation covered by the security under the original security agreement.

The judgment of the trial court is affirmed.

All concur.