RENDERED: JUNE 16, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0161-DG

VERSAILLES FARM HOME AND GARDEN, LLC

APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.             NO. 2020-CA-0626
WOODFORD CIRCUIT COURT NO. 14-CI-00202

HARVEY HAYNES AND
JERRY RANKIN

APPELLEES

**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>AFFIRMING</u>**

Under Article 9 of the Uniform Commercial Code, priority of claims as between two secured creditors is determined by order of filing or perfection, provided that each had an appropriate security interest that has attached and that covered the collateral in question and any proceeds. The question we resolve in this case is whether the Woodford Circuit Court erred in its determination that the security agreement between Harvey Haynes, the debtor, covered future advances made by Jerry Rankin d/b/a Farmers Tobacco Warehouse ("Farmers") so as to have priority over the security interest claimed by Versailles Farm Home and Garden, LLC ("Versailles Farm") in Haynes' 2013 tobacco crop. We hold that the trial court did not err and therefore affirm its

judgment and the Court of Appeals' opinion, albeit on different grounds than as stated in that opinion.

## I. Factual and Procedural Background.

In 2012, Haynes and Farmers signed a simple security agreement with respect to Haynes' 2012 tobacco crop.[1]  Although the written agreement did not explicitly provide for future advances, Farmers periodically made advances to Haynes after execution of the 2012 security agreement with the advances typically being evidenced by Haynes' promissory notes to Farmers referring to the security agreement.  Farmers perfected its security interest by filing a financing statement with the Kentucky Secretary of State on October 30, 2012.[2]  Versailles Farm makes no argument as to the sufficiency of Farmers' financing statement and concedes that Farmers was the first to file.[3]  Following the sale of Haynes' 2012 crop, and as of June 25, 2013, Haynes' indebtedness to Farmers was $181,401.86.

On that date, Haynes signed another security agreement granting Farmers a security interest in his 2013 tobacco crop, stating "I the above debtor in exchange for value received, do grant to the secured party a security interest in the following property: 100 acres of burley tobacco and any

---

[1] This security agreement was dated June 22, 2012 and granted a security interest in "100% of 90 acres of burley tobacco and any insurance proceeds from the crop and the attached list of farm equipment."

[2] Farmers also filed financing statements with the Kentucky Secretary of State in 2011, 2013 and 2014.

[3] Following the filing of its brief, Farmers moved to correct a misstatement therein as to the date its financing statement was filed.  Because all parties agree that Farmers filed its financing statement first, its misstatement is inconsequential.

insurance proceeds from the crop."[4]  As found by the trial court, Farmers advanced approximately $213,200 to Haynes between June 25 and December 31, 2013.  These advances were evidenced by demand promissory notes which provided, "This note and all sums payable hereunder are secured by a Security Agreement on certain personal property from Debtor dated _____, 2013."  The trial court identified 23 such promissory notes.

On July 1, 2013, Haynes obtained a $75,000 loan from Versailles Farm.  In doing so, he signed a Promissory Note and a Collateral Security Agreement identifying the collateral as "the 2013 crops grown on . . . Backer Farm . . . 80 acres of tobacco . . . Farm at Iron Works Pike and Hwy 25 . . . 16 acres of tobacco . . . and the proceeds of sale of said crops, and any and all crop insurance proceeds. . . ."  Versailles Farm filed its financing statement with the Kentucky Secretary of State on August 29, 2013.  In November 2013, Versailles Farm also notified Farmers of its perfected security interest but did not receive any proceeds of sale.[5]  Haynes subsequently defaulted on his obligation with Versailles Farm.

Versailles Farm then brought this action in 2014 against Haynes to collect on the balance due under his note.[6]  During the course of discovery,

---

[4] In addition, Haynes also signed another security agreement with Farmers on April 4, 2013 granting a security interest in "[a]ll farm machinery."

[5] Prior to making its loan, Versailles Farm apparently did not check the U.C.C. records at the Secretary of State's office, nor inquire of Farmers as to its interest in Haynes' 2013 tobacco crop.

[6] In its brief, Versailles Farms claims a principal balance of $59,329.25, plus interest, costs and attorney's fees.

Versailles Farm discovered Farmers had retained sale proceeds and insurance proceeds from the sale of Haynes' 2013 tobacco crop totaling $255,460.12. The trial court granted Versailles Farm's motion to join Farmers as a party to assert its claim against Farmers for conversion to the extent Farmers retained any proceeds in excess of $181,401.86. As stated in its brief,

> The basis of [Versailles Farm]'s claim is that, in the absence of a future advance clause in [Farmers]'s June 25 Security Agreement, the loans it made to Haynes after June 25, 2013 were unsecured. Since [Versailles Farm] held a perfected security interest in the crop, [its] right to the proceeds after payment of [Farmers]' secured claim was superior to [Farmers]' unsecured claim under the priority rules of KRS 355.9 (Kentucky's Article 9).

Farmers' answer admitted selling a portion of Haynes' 2013 tobacco crop, retaining the proceeds, but denied doing so in contravention of Versailles Farm's security interest. It further asserted a cross-claim against Haynes claiming a first and superior lien in Haynes' 2013 tobacco crop pursuant to the 2012 and 2013 security agreements as perfected by its financing statement.

The trial court granted Versailles Farm's motion for summary judgment against Haynes. Versailles Farm and Farmers filed cross-motions for summary judgment as to their respective priorities. The trial court denied Versailles Farm's motion and granted Farmers'. In so ruling, the trial court rejected Versailles Farm's argument that a future advance clause must be explicitly set out in the parties' written security agreement and held that, because the U.C.C.[7] defines "agreement" as "the bargain of the parties in fact, as found in

---

[7] Uniform Commercial Code. Kentucky's version of the U.C.C. is codified at KRS Chapter 355.

their language or inferred from other circumstances, including performance, course of dealing and usage of trade[,]" KRS[8] 355.1-201, Farmers' and Haynes' course of dealing over 2012 and 2013 established that future advances were within the contemplation of their agreement. Regarding the agreement between Haynes and Farmers, the record contains Tommy Kirkpatrick's and Jerry Rankin's affidavits, on Farmers' behalf, stating that they had substantial meetings and conversations with Haynes at the time the June 25, 2013, security agreement was signed. Both men averred that Haynes had been selling tobacco at Farmers since 2011 and that Farmers had been "extending secured credit . . . to him for production and operating expenses that entire time." In addition, the parties agreed the agreement "would secure not only Haynes' prior outstanding indebtedness . . ., but . . . was being executed primarily for the purpose of securing future advances . . . with regard to Haynes' future expenses incurred in connection with the harvesting of Haynes' 2013 tobacco crop (and credit for other purposes)." The trial court subsequently denied Versailles Farm's motion to alter, amend or vacate.

Versailles Farm then appealed to the Court of Appeals, which affirmed the trial court's judgment. While the Court of Appeals agreed with Versailles Farm that Farmers' security agreement did not contain a future advance clause, it reasoned that Versailles Farm could not rely on the absence of such a clause because it was unaware of that security agreement or Farmers'

---

[8] Kentucky Revised Statutes.

5

financing statement when it, Versailles Farm, made its loan to Haynes.

Versailles Farm moved for discretionary review, which we granted.[9]

## II.    Standard of Review.

This matter is subject to the oft-stated rule that "summary judgment is proper only where the movant shows that the adverse party cannot prevail under any circumstances." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 479 (Ky. 1991).  Furthermore, CR[10] 56.03 states that summary judgment is appropriate if the evidence  demonstrates "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The movant bears the initial burden of demonstrating the absence of disputed material facts; the opposing party then must present "at least some affirmative evidence showing . . . a genuine issue of material fact for trial."  807 S.W. at 482.  A party responding to a properly supported summary judgment motion cannot merely rest on the allegations in its pleadings. *Continental Cas. Co. v. Belknap Hardware & Mfg. Co.*, 281 S.W.2d 914, 916 (Ky. 1955).

In addition, this case also turns on the issue of contract formation— which is a question of law to be reviewed de novo, when, as here, the relevant facts are undisputed.  *Baumann Paper Co. v. Holland*, 554 S.W.3d 845, 848 (Ky. 2018); *see also Ky. Shakespeare Festival, Inc. v. Dunaway,* 490 S.W.3d

---

[9] While Haynes has been included in the Notice of Appeal and the Motion for Discretionary Review, he has not participated in the appellate proceedings.

[10] Kentucky Rules of Civil Procedure.

6

691, 695 (Ky. 2016) (holding that "[t]he interpretation of a contract, including determining whether a contract is ambiguous, is a question of law to be determined de novo on appellate review[]").

And, to the extent we are asked to interpret statutes, specifically here the provisions of Kentucky's version of the U.C.C., KRS Chapter 355, "we give the words of the statute their literal meaning and effectuate the intent of the legislature." *Samons v. Ky. Farm Bureau Mut. Ins. Co.*, 399 S.W.3d 425, 429 (Ky. 2013). Our statutory analysis "is also a matter for de novo review, *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007), and accordingly, we look anew at this issue, respectfully considering the opinions of the lower courts but without deference to their legal conclusions." *Lee v. Kentucky Dep't of Corr.*, 610 S.W.3d 254, 257 (Ky. 2020).

### III.  Analysis.

As argued by Versailles Farm, the June 25, 2013, security agreement between Haynes and Farmers failed to include a permitted future advance clause. Versailles Farm cites our recent decision in *Mostert v. Mostert Group, LLC*, 606 S.W.3d 87 (Ky. 2020), for the proposition that contracts are to be interpreted according to their clear and unambiguous terms, and resort to extrinsic evidence is permissible only if the terms are ambiguous. *Id.* at 91. Since the parties failed to include an explicit future advance clause, as permitted by KRS 355.9-204, Versailles Farm argues, none existed and therefore future advances were not covered under the agreement. The result, Versailles Farm argues, is that Farmers' advances after June 25, 2013, never

7

attached to the security interest, were unsecured, and thus had no priority. We disagree.

As an initial matter, we reaffirm our holding in *Mostert*. Parties are bound by the clear and unambiguous terms in their contracts. The issue in *Mostert*, however, involving the construction of two documents, a Contribution Agreement and a Security Agreement, *id.* at 91, did not involve interpretation of the U.C.C. or priorities thereunder. Instead, issues arose because collateral subject to the agreements was variously described as "software" or "source codes" and the dispute concerned which of two parties had breached the Contribution Agreement. By contrast, interpretation of the U.C.C. is directly involved in this case.

The U.C.C. provides that "a security agreement is effective according to its terms between the parties, against purchasers of collateral, and against creditors." KRS 355.9-201(1). Attachment and enforceability of a security interest is set out in KRS 355.9-203. Under its first subsection, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral[.]" KRS 355.9-203(1). Its next subsection defines when the security interest is enforceable against the debtor and third parties with respect to the collateral: when value has been given; the debtor has rights in the collateral; and the debtor has authenticated a security agreement that provides a description of the collateral. KRS 355.9-203(2)(a)-(c). And "[a] security agreement **may** provide that collateral secures . . . future advances or other value, whether or not the advances or value are given pursuant to

8

commitment." KRS 355.9-204(3) (emphasis added). Under the commentary to this last subsection, "[d]etermining the obligations secured by collateral is solely a matter of construing the parties' agreement under applicable law." KRS 355.9-204 Official Comment 5.

As recognized by the trial court, of first import is determination of what constitutes the parties' "security agreement." KRS 355.9-102(1)(bv) defines "security agreement" as "an agreement that creates or provides for a security interest[.]" Significantly, the Official Comment states,

> The definition of "security agreement" is substantially the same as under the former Section 9-105—an agreement that creates or provides for a security interest. **However, the term frequently was used colloquially in former Article 9 to refer to the document or writing that contained a debtor's security agreement. This article eliminates that usage**, reserving the term for the more precise meaning specified in the definition."

KRS 355.9-102 Official Comment 3.b. (emphasis added).

Article One of the U.C.C. sets out general provisions applicable to other articles of the U.C.C. *See* KRS 355.1-102 (stating "'[t]his article applies to a transaction to the extent that it is governed by another article of the Uniform Commercial Code[]"). In the following section, KRS 355.1-103(2) sets forth the general rule that "[u]nless displaced by the particular provisions of the [U.C.C.], the principles of law and equity . . . supplement its provisions." Stated another way, express provisions of the U.C.C. control.

KRS 355.1-201(2)(c) defines "agreement" as follows: "'[a]greement' as distinguished from 'contract,' means the bargain of the parties in fact, as found in their language **or** inferred from other circumstances, including course of

9

performance, course of dealing, or usage of trade as provided in KRS 355.1-303[.]" KRS 355.1-201(2)(c) (emphasis added).[11] The referenced statute sets forth definitions and rules for course of performance, course of dealing, and usage of trade:

> (1) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:
>
> > (a) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
> >
> > (b) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.
>
> (2) A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
>
> (3) A "usage of trade" is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage must be proved as facts. If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law.
>
> (4) A course of performance or course of dealing between the parties or usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement, may give

---

[11] Under the comments,

> As used in the Uniform Commercial Code, **the word ["agreement"] is intended to include full recognition of usage of trade, course of dealing, course of performance and the surrounding circumstances as effective parts thereof, and of any agreement permitted under the provisions of the Uniform Commercial Code to displace a stated rule of law.** Whether an agreement has legal consequences is determined by applicable provisions of the Uniform Commercial Code and, to the extent provided in Section 1-103, by the law of contracts.

KRS 355.1-201, Official Comment ¶ 3 (emphasis added).

10

particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement. A usage of trade applicable in the place in which part of the performance under the agreement is to occur may be so utilized as to that part of the performance.

KRS 355.1-303.

Read together, these sections, KRS 355.9-203(2), 355.9-204(3), 355.1-201(2)(c), and 355.1-303 do not require that a future advance clause be explicitly included in a written security agreement. In fact, these provisions carry out the liberal construction intended by the drafters of the U.C.C. and our legislature, as required by KRS 355.1-103(1), as also contemplated by the commentary to KRS 355.1.303:

> The Uniform Commercial Code rejects both the "lay-dictionary" and the "conveyancer's" reading of a commercial agreement. **Instead the meaning of the agreement of the parties is to be determined by the language used by them <u>and</u> by their action, read and interpreted in the light of commercial practices and other surrounding circumstances. The measure and background for interpretation are set by the commercial context, which may explain <u>and supplement even the language of a formal or final writing</u>**.

KRS 355.1-303, Official Comment ¶ 1 (emphasis added).[12]

Thus, a security agreement, properly construed, requires only authentication by the debtor and a description of the collateral. KRS 355.9-203(2). As stated in the commentary, the authentication of a security agreement "compli[es] with an evidentiary requirement in the nature of the Statute of Frauds[,]" and "represents the most basic of the evidentiary

---

[12] *See also* KRS 355.2-202(1) (final written agreement under U.C.C. Article 2 "may be explained or supplemented: [b]y course of performance, course of dealing, or usage of trade[]").

11

alternatives, under which the debtor must authenticate a security agreement that provides a description of the collateral." KRS 355.9-203, Official Comment ¶ 3; *see also Continental Can Co. Inc., v. Owensboro Canning Co. Inc. (In re Owensboro Canning Co.)*, 82 B.R. 450, 453-54 (W.D. Ky. 1988) (applying Kentucky law and holding that letter agreement granting lien on described collateral and signed by debtor was sufficient to constitute security agreement, and that no requirement existed "that the amount secured or a maturity date be shown[]"); *New West Fruit Corp. v. Coastal Berry Corp.*, 1 Cal.App.4th 94, 97-98 (1991) (holding that security agreement does not need to specify the value of the loan or the debtor's obligation and "as long as the formalities of section [9-203] are met, any payment or performance obligation covered by the security agreement may be secured[]"); *Baldwin v. Hays Asphalt Constr., Inc.*, 893 P.2d 275 (Kan. Ct. App. 1995) (citing U.C.C. section 9-203 and holding that "[n]othing requires the security agreement to reference the underlying obligation . . . before the security will attach[]").

The record demonstrates the basic evidentiary requirement that Haynes authenticated a security agreement granting a security interest in his 2013 tobacco crop to Farmers. The parties' course of performance and course of dealing supplemented that writing, demonstrating their agreement with respect to the production credit to be advanced by Farmers to Haynes, *i.e.*, the future advances, over the ensuing months of 2013 were to be secured by Haynes' 2013 tobacco crop. Kirkpatrick and Rankin so testified. And the parties' previous course of dealing as to advances and repayment when tobacco was

12

sold confirm the agreement. This evidence was sufficient to establish the "bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade." KRS 355.1-201(2)(c). The record is devoid of any contrary evidence. Because the parties' agreement covered Farmers' advances made after June 25, 2013, its security interest attached and was perfected by its October 30, 2012, financing statement filed with the Secretary of State, which in turn gave it priority over Versailles Farm's claim.[13]

Versailles Farms argues that this result is contrary to the holding in *ITT Indus. Credit Co. v. Union Bank & Trust Co.*, 615 S.W.2d 2 (Ky. App. 1981). The facts in that case were that a debtor, in 1973, purchased a trencher, a large piece of equipment, which it financed through ITT by giving a security agreement. The security agreement and a financing statement were properly filed. In 1975, the debtor bought a new trencher and gave a security interest in both the old and new trencher to a bank, a different creditor. Again, a financing statement was properly filed. In September 1977, the debtor paid off the first debt to ITT, but no termination statement was filed as to that security interest. A month later, the debtor bought more equipment, and gave a

---

[13] While we might agree that the better course is to set out all the particulars of a security agreement in a more detailed written document, a clear understanding of the Uniform Commercial Code, specifically the interactions of Article 1 and 9, does not so require in every case. That noted, the facts of this case may present the unusual situation in which the course of performance and course of dealing between the parties was sufficient to establish their bargain in fact.

security interest to ITT in this equipment as well as the original 1973 trencher. The question arose as to who had priority with respect to the 1973 trencher.

The court noted that if the security agreement is intended to protect future advances, the security agreement should so specify, and "[a] security agreement does not extend to future advances where the security agreement does not so provide." *Id.* at 4 (quoting 4 R. Anderson, Uniform Commercial Code § 9-204:1(8)(2d ed. 1971)).  The court, in the following paragraph, stated "'whether a particular future advance is protected by a security interest depends upon whether it was within the contemplation of the parties that the advance be made and secured by the security interest.'" *Id.* (quoting 4 R. Anderson, Uniform Commercial Code § 9-204:16)).  The court then noted, as "certainly **not apparent[,] that ITT and [the debtor] contemplated the future advance at the time the original loan was made**." *Id.* (emphasis added).  To this point, the *ITT Industrial* opinion is consistent with our opinion today. However, the court also added comments supportive of a subsequent creditor's failure to inquire of the prior perfected creditor's security interest, *id.*,[14] which ignored that a filed financing statement, then as now, did not require any indication as to the existence of future advances, *id.; see* KRS 355.9-402(1),(3)

---

[14] While we believe the Court of Appeals erred both in a) failing to properly analyze whether Farmers' security agreement covered future advances and b) denying priority based on a failure to inquire into a prior security interest, we understand the latter error based on *ITT Industrial.*  As pointed out by the *amici*, lenders are on notice of filings made pursuant to KRS 355.9-501.  Failure to exercise due diligence means that lenders move forward at their peril.  Following a proper examination that discloses a prior security interest, lenders have choices: (i) refuse to extend credit; (ii) accept a subordinate position; (iii) insist on alternate collateral; or (iv) obtain a termination statement or subordination agreement from the prior lender.

(1973) (financing statement required names and addresses of debtor and secured party, description of collateral and signatures of both parties), and required written provision for future advances in security agreement. *Id.* at 4-5 (this requirement also ignored the then provisions of KRS 355.1-201(3) (1973) which defined "agreement" the same as it currently does).[15]

As pointed out by the *amici*, the decision in *ITT Industrial* has been justifiably criticized by several commentators, specifically on the grounds that it ignored the mandated priority set forth in KRS 355.9-312(5)(a) (first-to-file rule)[16] based on the court's equitable considerations. Harold R. Weinberg, Louise Everett Graham & Thomas J. Stipanowich, *Modernizing Kentucky's Uniform Commercial Code*, 73 Ky. L. J. 515, 547-48 (1984); Richard H. Nowka, *Commercial Law*, 72 Ky. L. J. 337, 342-52 (1983). Accordingly, we today expressly overrule *ITT Industrial.*

Versailles Farm finally argues that the security agreement between Haynes and Farmers only cited "in exchange for value received" as the consideration and thus could only be considered as encompassing past due amounts owed by Haynes to Farmers. Again, we disagree.

As defined in the U.C.C.,

Except as otherwise provided in Articles 3, 4, and 5 of this chapter, a person gives value for rights if the person acquires them:

(1) in return for a binding commitment to extend credit or for the extension of immediately available credit, whether or not drawn

---

[15] This final failure likely was the result of the transaction between ITT and its debtor having been drafted in a more comprehensive manner than that in the instant case.

[16] The first-to-file rule is now codified at KRS 355.9-322.

upon and whether or not a charge-back is provided for in the event of difficulties in collection;

(2) as security for, or in total or partial satisfaction of, a preexisting claim[.]

KRS 355.1-204. This section refutes Versailles Farm's argument. Farmer's commitment to extend credit to Haynes, as shown by their agreement, previously addressed, constituted "value" under this section. No other interpretation is possible.

Because the foregoing resolves the issues in this case, we do not address the parties' remaining arguments regarding the Court of Appeals' opinion.

### IV.    Conclusion.

For the foregoing reasons, we affirm the Woodford Circuit Court's summary judgment in favor of Jerry Rankin d/b/a Farmers Tobacco Warehouse.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Cassie Wells Barnes
Hoffman & Barnes

COUNSEL FOR APPELLEE,
HARVEY HAYNES:

Harvey Haynes, Pro se

COUNSEL FOR APPELLEE,
JERRY RANKIN:

Lisa Koch Bryant
Tilford Dobbins & Schmidt PLLC

16

COUNSEL FOR AMICUS,
COMMERCIAL LAW AMICUS
INITIATIVE:

John T. McGarvey
M. Thurman Senn
Kami E. Griffith
Morgan Pottinger McGarvey


COUNSEL FOR AMICUS,
KENTUCKY BANKERS
ASSOCIATION:

John T. McGarvey
M. Thurman Senn
Kami E. Griffith
Morgan Pottinger McGarvey

Debra Kaye Stamper
Vice President and General Counsel
Kentucky Bankers Association